Submitted on record and briefs December 2, 2005, affirmed September 6, 2006

Michael D. SMITH,
*Respondent,*

*v.*

Gaetano DI MARCO,
*Appellant.*

18-04-20616; A128155

142 P3d 539

Gaetano Di Marco submitted the brief *pro se*.

No appearance for respondent.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Respondent appeals a judgment granting petitioner's request for a permanent stalking protective order (SPO), challenging the legal sufficiency of the evidence. On *de novo* review, *Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130 (1998), we affirm.

The background for this case is that petitioner and his former girlfriend, Danielle Di Marco, are the parents of three children. Respondent is Danielle's father. Petitioner and respondent did not get along throughout petitioner's relationship with Danielle. In particular, respondent blamed petitioner for his daughter's problems with drugs.

The friction between petitioner and respondent manifested itself in continuing disputes over the custody of the children, in particular, the youngest daughter, C. When Danielle was arrested on drug charges, petitioner moved for emergency custody of the children. So did respondent. The juvenile court ultimately awarded custody to petitioner. The Department of Human Services (DHS), however, later intervened and took custody of the children when it became concerned that petitioner had begun using drugs.

Following that, petitioner filed a petition for an SPO. He alleged six incidents as the basis for the petition.

The first incident occurred nearly eight years ago when Danielle had a drug overdose and was taken to the hospital. As petitioner later recalled the incident, he encountered respondent at the entrance to the emergency room, where respondent told petitioner that he was not permitted to go into the hospital. According to petitioner, respondent "thumped" him in the chest and told him that, if he attempted to enter the hospital, he would break his legs. Petitioner, however, testified that he "pushed [respondent] away and off to the side and went through the emergency doors and into the hospital."

The second incident occurred in July 2003, shortly after the court awarded petitioner emergency custody of his

children. At the time, respondent had been invited by petitioner to meet with his grandchildren on the patio of petitioner's grandmother's home. At the end of the visit, petitioner asked respondent if he had any questions about visiting the children in the future. Respondent replied, "[I]t's not the questions that I have, it's what I'm going to tell you." Respondent became angry, "began waving his fists," and swore at petitioner. According to petitioner, respondent said:

> "[H]e was going to take [C] one way or another. That he was going to take her by any means, how long, to and where, whenever he wanted to, and he went to reach for [C] through the door—I blocked myself in so he could not take my daughter. He swung his fists at me a few more times."

Petitioner said that he avoided the swings and pushed respondent back out of the door. He testified that he had an immediate fear that respondent was going to harm him and that respondent was going to kidnap his child.

The third incident occurred in August 2003, when petitioner and Danielle were visiting with their three children at a park outside of a local school. As they left the school parking lot, petitioner heard squealing tires and saw respondent's truck slide into the opposite side of the street. Respondent emerged from the vehicle and began yelling at his daughter. As petitioner recalled the event, respondent "was very upset because he wasn't included—Danielle did not call him to come up and visit the girls." Respondent approached petitioner and Danielle. According to petitioner, respondent "[came] at me and went to grab my shirt and I pushed him back. I pushed him back a couple more times, back to his vehicle." At that point, respondent reached into his pocket, grabbed his cell phone, and called the police to report that petitioner had assaulted him. Petitioner meanwhile removed his children from the scene and called the police, as well. The police arrived at the scene and, after interviewing everyone involved, decided not to charge either petitioner or respondent. Petitioner testified that, during the incident, he was in fear for his own personal safety and for the safety of his children.

The fourth incident occurred in September 2004 during a family meeting with the DHS. Petitioner asked

respondent to stop stalking him and respondent replied, "[S]omebody's got to stalk you."

The fifth incident occurred in November 2004 after a hearing before the juvenile court in which petitioner was granted temporary custody of the children. Petitioner was walking in the courthouse hallway when he saw respondent coming out of the restroom. Respondent said, "[Y]ou ain't seen the worst of it yet."

Finally, petitioner complained that he had seen respondent following him on a number of occasions. On several occasions, petitioner testified, respondent would watch him from his car that was sometimes parked down the street and would peer through binoculars at the house where petitioner and the children were staying. On other occasions, petitioner stated that respondent would slowly drive "literally right beside me at a slow pace, you know, slower than normal traffic," as petitioner rode his bike down the street.

■ On appeal, respondent argues that petitioner did not present sufficient evidence that he engaged in two or more incidents of stalking as defined by the civil stalking statute. We disagree.

ORS 30.866(1) provides that a court may issue an SPO under the following circumstances:

> "(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

> "(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

> "(c) The repeated unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

If the contact at issue involves speech, the Oregon Supreme Court has recognized that Article I, section 8, of the Oregon Constitution requires that the person requesting the SPO establish that the contact constitutes a threat that "instills in

the addressee a fear of imminent and serious personal violence, * * * is unequivocal, and is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). In all events, the contacts must have occurred within two years of the filing of the petition for an SPO. ORS 30.866(6). We turn to the incidents of alleged stalking in this case to determine whether, taken as a whole, they meet the foregoing requirements of the law.

■ The first incident, in which respondent allegedly threatened to break petitioners' legs, occurred well over two years ago. As a result, the incident cannot itself be considered an unwanted contact under the terms of the statute. But it can be considered as context for other contacts that occurred within two years of the filing of the petition. *Jones v. Lindsey*, 193 Or App 674, 681, 91 P3d 781 (2004).

The second incident clearly qualifies. It involves not just hostile speech, but physical confrontation. Respondent took swings at petitioner and reached in the door to take C away. Petitioner testified that the conduct put him in fear for both his own safety and the safety of his daughter.

The third incident also clearly qualifies. Again, it involved both hostile, threatening language as well as physical confrontation. Respondent attempted to hit petitioner, and petitioner testified that the conduct put him in fear of immediate harm.

■ The fourth and fifth incidents, during which respondent stated that "somebody's got to stalk you" and "you ain't seen the worst of it yet" are problematic. They were uttered during a meeting with DHS and during a court proceeding, respectively, in the midst of discussions over who would have custody of the children. As the Supreme Court made clear in *Rangel,* the kinds of threatening contacts that may support the issuance of an SPO do not include the " 'hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.' " 328 Or at 303 (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)). In this case, under the circumstances, it seems unlikely that respondent's statements gave petitioner a fear of "imminent and serious personal violence" that was unequivocal and "objectively likely

to be followed by unlawful acts." *Id.* In any event, there was no testimony that petitioner actually felt such fear of imminent and serious violence.

The final series of contacts do qualify under the statute. Respondent repeatedly followed petitioner, peered at him through binoculars at a distance, and followed closely in a car as petitioner biked down the street. That conduct, petitioner testified, caused him to take special precautions to ensure that respondent was not able to kidnap his children.

In short, the record contains evidence of at least two instances of stalking, as defined by the civil stalking statute. Respondent's principal arguments to the contrary appear to be that petitioner, a convicted criminal, is not credible and that his "fundamental, and only, motive for petitioning the court for a Stalking Protective Order is to hinder [r]espondent's imminent adoption of a grandson and to deny [r]espondent's access and possible placement of [p]etitioner's own children."

On *de novo* review, we reject the former argument. As for the latter, petitioner's motivation is immaterial. The controlling question is whether respondent engaged in repeated, unwanted contacts that alarmed petitioner and put him in reasonable apprehension regarding his own safety and the safety of his children. It is clear that he did.

Affirmed.