Submitted February 10, affirmed September 10, 2014

Cynthia Jean RAGSDALE,
*Petitioner-Respondent,*

*v.*

Andrew Edson FLEMING,
*Respondent-Appellant.*

Jackson County Circuit Court
124278Z0; A153841

336 P3d 534

Donald Scales filed the briefs for appellant.

Cynthia Jean Ragsdale filed the brief *pro se.*

Before Duncan, Presiding Judge, and Wollheim, Judge, and Lagesen, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Respondent appeals from a judgment granting petitioner a permanent stalking protective order (SPO) and awarding petitioner attorney fees, arguing that the record contained insufficient evidence to support entry of the SPO under ORS 30.866(1). We conclude that the trial court did not err in issuing the permanent SPO under ORS 30.866(1) and affirm.[1]

Neither party requests *de novo* review, and this is not an exceptional case that merits exercising our discretion to do so. *See* ORS 19.415(3)(b) (authorizing discretion by this court to review the facts *de novo*); ORAP 5.40(8) (limiting exercise of *de novo* review to exceptional cases). Therefore, "we review the facts for any evidence and the legal conclusions based on those facts for errors of law." *Brown v. Roach*, 249 Or App 579, 580, 277 P3d 628 (2012) (internal quotation marks omitted).

Petitioner and respondent had an intimate relationship from March 2008 to May 2010. Petitioner was pregnant when they met. Although respondent is not the biological father, petitioner and respondent agreed to list respondent on the birth certificate when the child was born in June 2008. The effect of the agreement was to establish respondent as the legal father. Respondent moved in with petitioner five months later. Petitioner ended the relationship in May 2010, because respondent had become physically and emotionally abusive towards her. Petitioner allowed respondent to continue seeing their daughter because respondent had never shown aggression towards the child. However, over approximately the next two years, petitioner became increasingly concerned about respondent's conduct during the exchanges of the child. Petitioner tried to avoid meeting respondent unless other people were present. Petitioner repeatedly told respondent that she did not want to have contact with him and attempted to limit their contacts to public places. At first, respondent was sometimes agreeable to meet in public

---

[1] Respondent's argument regarding attorney fees is limited to arguing that, because the SPO should not have been granted, petitioner should not have been awarded attorney fees. Because we affirm the trial court's issuance of the SPO, we need not discuss respondent's argument regarding the award of attorney fees.

places, but then he frequently refused, especially after April 2012, when he relied on an order in the parties' custody case. Respondent asserted that it was better for the child to make the exchange at their homes.

Petitioner contacted the police several times between March and August 2012 to report conduct by respondent that made her feel unsafe and, on August 30, 2012, filed a petition for an SPO. The trial court issued a temporary SPO on September 7, 2012. The hearing for a permanent SPO began in February 2013, and petitioner, respondent, a police officer with whom petitioner had made contact, and an administrator from the child's preschool all testified. Petitioner testified that respondent became emotionally and physically abusive towards her after he moved in with her. Respondent "tracked everything [she] did," got upset if she was on the phone with family or anyone else, demanded that she look him in the eyes while he criticized her, and had angry outbursts during which he would throw down a dish or slam doors, once breaking the laundry room door. More than once, respondent physically blocked petitioner from driving away in her car by throwing himself between her and the steering wheel, "still scolding [her], or yelling at [her]," and physically keeping her from driving the car until she heard what he had to say.

Petitioner testified that, based on respondent's statements to her, both casually and in anger, she believed that respondent had been abusive and violent in the past. For example, in a casual conversation, he told her about a prior romantic relationship that had ended suddenly, when the woman had refused to talk to him, and he kept going to her house until she called the police to stop him. Another time, in anger, respondent remarked that everyone takes advantage of him, no one listens to him, and no one sees his side. Then he told her another story about his brother, who had disagreed with him, verbally "bash[ed]" respondent, and would not listen to him, and so respondent punched and beat up his brother because his brother "needed that."

Petitioner ended her intimate relationship with respondent in May 2010, because of respondent's violent

behavior towards her. Petitioner testified that there was a specific incident when she realized that respondent had crossed the line physically. This was in April 2010, when respondent blocked her in the bedroom and, while yelling at her, grabbed her hard and shoved her back a little, all the time looking at her with anger and rage. She was afraid for her life: "[T]he way he was looking at me with the anger, and the rage he had, and the way * * * I mean, just how he gets, the way he held me; I thought that he was going to hurt me or kill me. * * * I was in complete fear[.]"

Petitioner described numerous unwanted contacts with respondent in the months before she filed the petition for an SPO, including multiple instances during which respondent had lingered in his car—in front of her home, at their daughter's preschool, and other places where they exchanged the child—either watching or video-recording petitioner and her family. Petitioner also testified to specific instances when respondent threw a plastic toy at her, lunged at her while yelling in her face, and followed her in his car. She explained that those repeated contacts with respondent only increased her alarm and made her more afraid for her personal safety because, in the context of respondent's controlling behavior towards her during their relationship, she was afraid when he continued to follow, track, and wait for her in parking lots after she asked him to stop. She did not know what respondent would do next and felt like he was "capable of anything" and could "harm [her] severely."

Respondent's testimony conflicted with petitioner's testimony. He denied ever threatening petitioner with violence, either by his words or actions. He understood that, as of August 2012, petitioner did not want him at her house but denied knowledge of the particular behavior that was making petitioner uncomfortable. Respondent believed that everyone was conspiring against him.

The trial court found petitioner to be credible and was persuaded by the e-mails submitted into evidence that she was afraid of respondent. In contrast, the court found that respondent lacked credibility, and that he was "a passive-aggressive individual" who used the unwanted contacts "to impose himself on the life of [petitioner]" and cause

stress to her and her new companion. On February 20, 2013, the trial court issued the permanent SPO, orally explaining:

"[Respondent] lacks credibility. You know, you can explain an occasional contact as coincidence. You can't explain all of these coincidences. And for me to disbelieve entirely [petitioner']s story, I have to assume she totally fabricated all these emails, and I'm not going to assume that. Those emails tell a story. And they tell a story of somebody who doesn't want to have the contact she's having with this individual. I'm also very persuaded by the school person that was in here * * *

"* * * * *

"She was the first witness, I believe. I mean she wasn't upset because [respondent] shows up 15 minutes early and parks out on the street to pick up a child; she was upset because she didn't feel comfortable having him on the property. And there's a big difference there, in my opinion. I'm not taking into account at all what occurred after the Stalking Order was entered. I don't think it's relevant. It's not on my radar screen. But it seems to me that [respondent] is a passive-aggressive individual, who uses this unwanted contact as a way to impose himself on the life of [petitioner] and cause her stress in the process, and perhaps, as much as that, causing stress on her fiancé or boyfriend, whatever this guy is. I think that's part of the issue here. So I mean it's just—*he's got an explanation for everything. They just don't fly.* 'I just happened to have my car parked at the mall after I dropped the child off. I just happened to be behind her, because I am looking for a place to live,' but then he doesn't move. He just happens to get kicked out of the school because he's handing a—or some lawyer's business cards. You know, 'I went in to the house and pushed the wagon towards her.' I mean it's just—it paints a picture that is not believable. And part of my job as a judge is to figure out fact from fiction, and this just sounds like fiction to me. I believe she's afraid of him. I believe she's apprehensive of him. I believe she's told him 'I don't want to have contact with you.' She's suggested the police station. If this was fabricated, it should have been his suggestion. And so, I'm upholding the Stalking Order."

(Emphasis added.)

On appeal, respondent assigns error to the trial court's grant of the permanent SPO. He acknowledges that

he "expresses frustration towards petitioner"; "engage[s] in emotional and angry verbal exchanges, primarily regarding access to his child"; and "generally makes her life annoying as she would prefer he leave the child's life forever." However, respondent argues that he "is not alleged to have verbally threatened [p]etitioner's life or safety," and, at most, his threats "constituted 'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *See Brown*, 249 Or App at 584 (quoting *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999)). Respondent contends further that none of the nonexpressive contacts satisfy the statutory requirements, and, except for the allegation that he followed her, all of the alleged contacts involved court-ordered custody exchanges between the parties.

Petitioner responds that, in the totality of the circumstances, the evidence was sufficient to justify the court issuing the SPO:

"Between the summer of 2011 through August 2012, [respondent] has physically restrained [petitioner] while yelling at her; lunged at her while yelling threatening comments; threw a [toy] wagon at her while in an angry rage; lingered in her driveway, in front of her house, and in parking lots while glaring at her causing her to feel unsafe and afraid to be alone; refused to conduct child exchanges in public locations or police stations; recorded her and her family without telling them; parked down the street from [a] location he knew [petitioner] would be, pulled out behind her, and followed her closely in his car; bullied and threatened school staff where the child attends; [and] left items on [petitioner's] doorstep when she was or was not at home without notifying her."

Petitioner asserts that "[her] intense fear of [respondent] is a result of abuse and control that started to occur during their relationship and has escalated up until the day the stalking citation paperwork was completed in August 2012 and served in September 2012." She contends that the repeated and unwanted contacts caused her reasonable apprehension regarding her personal safety or the safety of her child in light of her past abuse by him, knowing that "he could be watching or tracking her at any moment, as he did

this often," and fearful that when she met him in front of her or his house, "she or her family could be a victim to his angry verbal and physical attacks."

In evaluating petitioner's evidence for legal sufficiency, "we must determine whether [petitioner] presented enough evidence, as a matter of law, to permit reasonable persons to conclude that the evidence established each element by the requisite burden of proof (here, preponderance of the evidence)." *Delgado v. Souders*, 334 Or 122, 134-35, 46 P3d 729 (2002). Oregon's civil stalking statute, ORS 30.866(1), requires proof of three elements:

> "A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:
>
> "(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;
>
> "(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and
>
> "(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

As we recently explained in *Christensen v. Carter/ Bosket*, 261 Or App 133, 139-40, 323 P3d 348 (2014), "[t]hat statute requires that a petitioner demonstrate that there were two or more unwanted contacts with either the petitioner or a member of the petitioner's immediate family within the previous two years"; "each contact must give rise to subjective alarm and that alarm must be objectively reasonable"; and "[t]he contacts, cumulatively, [also] must give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and that apprehension must be objectively reasonable." *Id.* (internal quotation marks omitted); *see also Pinkham v. Brubaker*, 178 Or App 360, 372-73, 37 P3d 186 (2001) (considering "the totality of the circumstances" to conclude that the respondent "made

repeated, unwanted nonexpressive contacts with [the] petitioner and her daughters, that those contacts subjectively alarmed [the] petitioner and caused her to fear for her and her daughter's safety * * *, and that [the] petitioner's alarm was objectively reasonable").

A "contact," within the meaning of ORS 30.866(1), includes but is not limited to:

"(a)   Coming into the visual or physical presence of the other person;

"(b)   Following the other person;

"(c)   Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d)   Sending or making written or electronic communications in any form to the other person;

"(e)   Speaking with the other person by any means;

"* * * * *

"(k)   Delivering directly or through a third person any object to the home, property, place of work or school of the other person; * * *

"* * * * *"

ORS 163.730(3).

Under ORS 30.866(1), a contact is alarming if it causes "apprehension or fear resulting from the perception of danger," ORS 163.730(1), which means "a threat of physical injury, and not merely a threat of annoyance or harassment," *Christensen*, 261 Or App at 144. Although each contact must give rise to alarm, the contacts should be viewed in context "in order to determine whether they give rise to objectively reasonable alarm." *Christensen*, 261 Or App at 141 (citing *Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000)); *see Pinkham*, 178 Or App at 372 (concluding that the petitioner's alarm was objectively reasonable when considered in the context of the parties' entire history).

The standard set by ORS 30.866(1) applies to nonexpressive contacts. We apply a more stringent standard to

evaluate the sufficiency of evidence for expressive contacts than for nonexpressive contacts. Because expressive contacts, which are communicative rather than physical, may be protected by Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution, the petitioner must prove that the communication "'instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts.'" *Christensen*, 261 Or App at 140 (quoting *Rangel*, 328 Or at 303). When a contact includes both expressive and nonexpressive conduct, we consider which aspect of the contact caused the alarm or coercion. *Id.* "However, the fact that speech cannot serve as a 'contact' in itself does not prohibit a court from considering it. Speech that does not meet the *Rangel* standard can provide relevant context for * * * nonexpressive contacts." *Id.* (internal quotation marks omitted); *see also Castro v. Heinzman*, 194 Or App 7, 14-15, 92 P3d 758 (2004) (explaining that evidence of the respondent's admission to the petitioner that he had been violent towards a former spouse, an expressive contact, provided context for the petitioner's objectively reasonable alarm and apprehension for her personal safety caused by his nonexpressive contacts).

In this case, the trial court did not specify which contacts provided the basis for its determination that petitioner presented legally sufficient evidence to obtain a permanent SPO. Therefore, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Christensen,* 261 Or App at 135 (internal quotation marks omitted). We conclude, based on the following contacts, that the record contains sufficient evidence to prove that two or more of the respondent's nonexpressive contacts were unwanted by petitioner, subjectively caused her alarm, and would cause a reasonable person in petitioner's position alarm and apprehension for her personal safety.[2]

---

[2] Because we are satisfied that the other contacts supported the SPO, we need not consider petitioner's allegations that respondent left items on her doorstep after she had told him not to come on her property without permission.

Petitioner's testimony included references to contacts that occurred during their relationship between March 2008 and May 2010 to demonstrate that respondent had a history of abuse and violence. Because ORS 30.866(6) and ORS 163.730(7) require petitioner to demonstrate that there were two or more unwanted contacts within the previous two years, *Christensen*, 261 Or App at 139, we do not consider that testimony for qualifying contacts. However, in determining whether two or more timely contacts objectively caused petitioner alarm and apprehension regarding her personal safety, we do consider those previous contacts as context about the parties' relationship. *See Boyd v. Essin*, 170 Or App 509, 518, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001) (explaining that contacts might appear "innocuous * * * in isolation" but "take on a different character * * * in combination or against the backdrop of one party's assaultive behavior," and holding that, in the context of the respondent's history of violence and abusive behavior towards his family, the petitioner's alarm and apprehension for her personal safety was objectively reasonable); *Smith v. Di Marco*, 207 Or App 558, 560, 563, 142 P3d 539 (2006) (explaining that a contact that occurred nearly eight years earlier involving violence by the respondent towards the petitioner provided context for the qualifying contacts).

Petitioner testified that, during their relationship, respondent had angry outbursts, frequently criticized and scolded her, physically blocked her from leaving a room in her house and from driving away so that she was forced to hear his criticism, and regularly tracked her movements. Respondent also told her about his previous abusive and violent behavior, including a romantic relationship that ended with the woman calling the police to stop him from going to her house and a physical altercation in which respondent beat up his brother because he believed his brother was not listening to him. That background makes it objectively reasonable that petitioner would be concerned about contacts with respondent that are reminiscent of his previous abusive or violent behavior.

Before discussing specific contacts, we pause to discuss *Smith*, which provides useful context. We considered similar facts in *Smith*, in which we affirmed the trial court's

grant of a permanent SPO against the respondent, based, in part, on a contact involving a physical confrontation in which the respondent yelled and moved towards the petitioner, the father of his grandchildren, in anger. 207 Or App at 561. We viewed that contact in the context of the parties' historical relationship, including a contact that had occurred nearly eight years earlier, and two other qualifying contacts. *Id.* at 560-64.

The first incident, which the court considered as context, occurred eight years prior when respondent's daughter, Danielle, suffered a drug overdose. *Id.* at 560. At the time of the overdose, the respondent blamed the petitioner for Danielle's problems with drugs and had tried to keep the petitioner out of the hospital where Danielle was taken. *Id.* The respondent "thumped" the petitioner in the chest and told him that if he attempted to enter the hospital, he would break the petitioner's legs. *Id.* The petitioner pushed the respondent away and entered the hospital. *Id.*

The first qualifying contact in *Smith* occurred after Danielle was arrested on drug charges, and the juvenile court awarded the petitioner emergency custody of the couple's children. *Id.* at 560-61. It involved an incident in which the respondent threatened the petitioner that he was going to take one of the children away by any means, went to reach for the child, and swung his fists at the petitioner who had blocked him. *Id.* In the second qualifying contact—the one most similar to this case—the petitioner was leaving a playground with Danielle and the children when the petitioner "heard squealing tires and saw respondent's truck slide into the opposite side of the street." *Id.* at 561. The respondent emerged from his vehicle and began yelling at Danielle, upset because he had not been invited to visit with the children. *Id.* The respondent moved towards the petitioner to grab his shirt, and the petitioner pushed him back a few times to his vehicle. *Id.* Both parties separately called the police, who came to investigate the matter. *Id.* The third series of qualifying contacts included the respondent repeatedly following the petitioner, peering at the petitioner's house from a distance through binoculars, and following closely in a car as the petitioner biked down the street. *Id.* at 562. We concluded that the first two contacts involved hostile speech

and physical confrontations that put the petitioner in fear for his safety and that of his daughter, and the third series of contacts caused the petitioner "to take special precautions to ensure that [the] respondent was not able to kidnap his children." *Id.* at 563-64 We return to two specific contacts in this case.

We begin with the contact on March 13, 2012, when respondent threw a toy wagon at petitioner. During that custody exchange in front of respondent's house, the parties argued at the doorstep, and respondent slammed the door. Petitioner was concerned about her daughter and knocked again on respondent's front door. Respondent answered the door, and the parties argued again. Respondent threw a toy wagon at petitioner, which missed, while calling petitioner a "bitch" and yelling, "[T]ake that for your parenting plan!"[3] He then picked up the child, stared at petitioner and, in a "demented voice," said, "[W]e don't want to be mean to mommy in front of [the child]" and closed the door. Petitioner immediately called, and later e-mailed, the police, reporting that she did not feel safe for herself and her child.[4] The police sent an officer to check on the welfare of the child, and the child was fine. On appeal, respondent contends that, even if he did throw the toy wagon at petitioner, "[a] plastic toddler's toy is not something that could cause serious physical injury or objectively reasonable apprehension of immediate physical injury as required under ORS 30.866."

Respondent incorrectly applies the more stringent standard for expressive contacts, in which the petitioner must prove that the communication instilled a fear of imminent and serious personal violence from the speaker. We agree that respondent's statements to petitioner do not satisfy the *Rangel* standard, and we consider those statements only as context for his nonexpressive conduct. Applying the less stringent standard for nonexpressive contacts in ORS

---

[3] At the hearing, respondent denied that he threw the toy wagon at petitioner, claiming that he merely rolled it to her. The court did not believe him.

[4] In an e-mail to a Medford police officer dated March 14, petitioner wrote, "I felt threatened yesterday, especially after he said that, 'We don't want to be mean to mommy in front of [the child].' He gave me a deep stare when he said this. Honestly, I think he is going off the deep end. I do not feel safe for [the child] or myself at this point."

30.866, we conclude that petitioner's alarm and apprehension caused by respondent throwing a toy at her in the context of an angry encounter was objectively reasonable. Petitioner's testimony that she immediately called and later e-mailed the police, stating that she felt threatened and unsafe for herself and her child, was sufficient to establish that she was subjectively alarmed and apprehensive. Therefore, petitioner presented sufficient evidence to prove all three elements in ORS 30.866(1) for this contact.

Another contact occurred in April 2012, involving another custody exchange, this time in front of petitioner's house. The child was crying because she did not want to go with respondent for parenting time. While petitioner was trying to put the child in respondent's car, respondent angrily lunged at petitioner and yelled in her face. Petitioner's boyfriend intervened and told respondent to calm down. Respondent went to the police station and requested a police presence for the custody exchange. Petitioner also contacted the police. The police came and were present for the exchange. On appeal, respondent argues that lunging and yelling at petitioner may be considered obnoxious, but because he made no physical contact or threats of physical injury, an objective person would not reasonably be alarmed or coerced by this conduct.

Again, we agree that respondent's statements to petitioner during the contact were insufficient to satisfy the *Rangel* standard for expressive contacts. However, we conclude that respondent's nonexpressive conduct satisfied the requirements of ORS 30.866(1).

Our discussion of the second contact is similar to the second qualifying contact in *Smith*, in which the respondent was yelling at the petitioner in front of his children and then moved to grab the petitioner's shirt. Although the fact-specific nature of SPO cases prevents us from drawing too close a comparison, *Smith* is instructive in the similarity of the respondents' nonexpressive conduct—yelling and moving towards the petitioner in anger in the context of prior physical confrontations.

Here, the contact is in the context of respondent's aggressive behavior towards petitioner during their past

relationship, when he had grabbed and pushed her, and their more recent physical confrontation when he threw a toy at her. Moreover, respondent engaged in this aggressive conduct while the child, who was already upset, was in petitioner's arms. We conclude that petitioner's alarm and apprehension for her personal safety and the safety of her daughter was objectively reasonable. Petitioner's testimony that, after the contact, she called the police because she was "shooken up" and did not know what respondent was going to do, is sufficient to establish her subjective alarm. Therefore, in the totality of circumstances, this contact qualifies under ORS 30.866(1).

The trial court did not err in granting the SPO, because the record contains sufficient evidence to establish two or more qualifying contacts under ORS 30.866(1). Accordingly, we affirm.

Affirmed.