Submitted March 13, reversed December 24, 2014

Pamela Marie HUBER,
guardian ad litem for Meriah Marie Huber,
*Petitioner-Respondent,*

*v.*

William Logan LANDOLT,
*Respondent-Appellant.*

Tillamook County Circuit Court
122012; A151249

341 P3d 175

James B. Ehrlich filed the briefs for appellant.

Andy Simrin and Andy Simrin PC filed the brief for respondent.

Before Duncan, Presiding Judge, and Hadlock, Judge, and Lagesen, Judge.

HADLOCK, J.

**HADLOCK, J.**

Respondent appeals a judgment imposing a stalking protective order (SPO) against him pursuant to ORS 30.866. He contends that the evidence was insufficient to support the entry of that SPO. We agree and, therefore, reverse.[1]

To establish that an SPO should issue under ORS 30.866, petitioner had the burden to prove, by a preponderance of the evidence, that each of the requirements of that statute were met. *Ragsdale v. Fleming*, 265 Or App 342, 348, 336 P3d 534 (2014).[2] The statutory requirements may be summarized as follows.

"First, a respondent's conduct must meet the statutory definition of 'repeated and unwanted contact' with the petitioner or a member of the petitioner's immediate family or household. Second, the petitioner must subjectively—*i.e.*, 'actually'—'be alarmed or coerced by the contacts' and that alarm or coercion must be objectively reasonable. Third, the contacts also must actually cause the petitioner apprehension about personal safety and that apprehension, too, must be objectively reasonable. Finally, the respondent must have acted with the requisite mental state."

*Braude v. Braude*, 250 Or App 122, 128-29, 279 P3d 290 (2012) (citations omitted).[3]

---

[1] We adhere to our practice in SPO cases of referring to the parties by their designation below. Accordingly, all references in this opinion to "respondent" are to respondent in the trial court and our references to "petitioner" are to the child who sought the SPO (and not to her guardian *ad litem*, who filed the petition on her behalf).

[2] ORS 30.866 provides:

"(1) A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

[3] "Article I, section 8, of the Oregon Constitution imposes an additional requirement in stalking cases in which the petitioner seeks to rely on a contact that involves speech. To avoid constitutional overbreadth problems, a contact that involves speech can serve as a predicate contact for an SPO only if it is a

The trial court entered the SPO against respondent on the basis of its conclusion that each of those statutory requirements was satisfied. Because this is not an exceptional case justifying *de novo* review, "we review the trial court's factual findings for 'any evidence' and its legal conclusions for errors of law." *Id.* at 124. We describe the facts in accordance with that standard.

Petitioner in this case is a child who was 13 years old at the time of the 2012 SPO hearing; petitioner's guardian *ad litem*—her maternal grandmother—filed the SPO petition on her behalf. Petitioner was removed from her biological mother's care when she was very young. Her maternal grandmother and step-grandfather adopted her in 2007, and because they are now petitioner's parents, we refer to them as such in the remainder of this opinion.

Some evidence suggests that respondent may be petitioner's biological father. However, any parental rights that respondent had with respect to petitioner were terminated in 2005. Respondent has a history of drug and alcohol use, as well as convictions for property and drug crimes; in addition, he physically abused petitioner's biological mother at some point around the time of petitioner's birth in 1999. However, respondent testified without contradiction at the 2012 SPO hearing that he had been drug and alcohol free for at least three years, and the trial court found that he had "been rehabilitated" and had become a "very loving, caring parent" to his other child, who is younger than petitioner and who has a different mother.

In early 2007—the year that petitioner's parents adopted her—respondent took a gift to petitioner's school for her eighth birthday; school personnel called petitioner's mother, who told them not to give petitioner the gift. Later that year, respondent called petitioner's mother and said he wanted to have contact with petitioner; she told him that there would "be no contact with her, no part of her life." That same year, petitioner met respondent at a cousin's birthday

---

threat." *Braude*, 250 Or App at 129 n 6 (internal quotations marks and citations omitted). Because we resolve this case on statutory grounds, we do not address respondent's argument that at least some of his contacts with petitioner involved constitutionally protected speech.

party; that is the first time that petitioner recalls having been with him. Petitioner also recalled making gingerbread houses with respondent around that time, although it was not clear if that occurred on a separate occasion apart from the birthday party.

In early 2008, respondent again attempted to give a birthday gift to petitioner by having his girlfriend take the gift to petitioner's school; again, school personnel intercepted the gift and did not deliver it to petitioner. In August of that year, petitioner went to a county fair with her parents. As she walked around the fair, she noticed that respondent was there and that he was following them. Respondent did not approach or otherwise attempt to make contact with petitioner or her family, but his presence made petitioner "really uncomfortable." Petitioner explained that she was uncomfortable because she had learned by then that respondent was "the man that did things to my mom," apparently referring to information she had received from her mother, who told petitioner that respondent had physically abused petitioner's biological mother and introduced her to drugs. Later in 2008, petitioner encountered respondent at a Halloween parade. Respondent arrived at the parade with "a kid on his shoulders" and, while there, took several photographs of petitioner, which he later posted on his social-media page. Petitioner testified that she was "very surprised" to see respondent at the parade and was "very scared" because her father was not there. The record includes no evidence that petitioner and respondent were in each other's physical presence at any other time.

After the 2008 Halloween parade encounter, there was no contact, in-person or otherwise, between petitioner and respondent until December 2011, when petitioner was 12 years old. That month, one of petitioner's classmates told petitioner that, if respondent wanted to write a letter to petitioner, the classmate would be able to deliver that letter to her.[4] According to the classmate, petitioner replied that she "wouldn't mind" getting a letter from respondent;

---

[4] The classmate's mother is friends with respondent and his girlfriend. The correspondence between petitioner and respondent apparently was facilitated by the classmate's mother and respondent's girlfriend.

petitioner testified that she answered "I don't care" when the classmate asked if she wanted a letter from respondent. Several days later, the classmate delivered an envelope to petitioner. Inside was a letter from respondent. According to petitioner, the letter was "[j]ust about daily life, like where he works and his dog's name." Petitioner testified that she thought that her classmate had authored the letter as a joke. Nonetheless, she wrote a reply addressed to respondent that same day and asked her classmate to deliver it. Petitioner's response covered a range of topics, including her upcoming birthday, her grades in school, and her relationship with a sibling. It concluded with the line, "Write back as fast as you can!"

Respondent wrote a second letter, and the class-mate delivered it the day after petitioner had responded to the first. The contents of respondent's second letter were not entered into evidence—petitioner having destroyed it, along with each of the other letters that she received from respondent. Petitioner testified that she did not remember the contents of the second letter very well, but stated that respondent had "repeated himself a little bit." She also stated that respondent had stated that "he was glad he had this opportunity to get to know me." Petitioner, who testified that she was still under the impression that her classmate actually had written both letters, penned a response that afternoon. The cover of the letter read: "To: [respondent.] From: [petitioner.] Thanks so much[.]" The letter itself had a chatty tone, telling respondent about her activities and inquiring about such things as respondent's age and favorite color. Petitioner also acknowledged that her mother did not know that she was writing to respondent (although her biological mother did) and admonished respondent not to tell. Petitioner testified that she received a response from respondent the next day that answered the questions that she had asked in her letter. Petitioner then followed up with a third, short letter in which she asserted that her mother felt that "it's like the end of the world" that respondent "did drugs" and also declared that she, herself, knew that respondent had changed. Petitioner expressed her gratitude that her classmate was "doing this for me and you" and closed the letter by promising "more soon."

Petitioner testified that, after sending that third response, she came to believe that respondent, not her classmate, had written the letters to her. When asked how she felt about that, petitioner stated, without elaboration, that she wished she had never replied to respondent because "if it was him, th[en] he would hurt me." Petitioner testified that she responded to respondent's third letter by requesting that he not send anything to her school and not send anything to her for her upcoming birthday. Respondent testified that he never received that response from petitioner.

Thereafter, petitioner received a fourth letter from respondent, which came in an envelope that had apparently been colored by respondent's young son. Petitioner did not describe the contents of this fourth letter, other than to say that it was signed, as each of the others had been, "Love, [respondent]." Petitioner stated that she felt ashamed of herself upon receiving the fourth letter, that she never should have written to him in the first place because respondent was "a bad person," and that she was "really alarmed that day."

Petitioner's thirteenth birthday was in early 2012, within a couple of months after she received the fourth letter from respondent. While petitioner was at school that day, she was contacted by school personnel who told her that a woman was waiting for her in the office. The woman was respondent's girlfriend; petitioner did not recognize her. The woman handed petitioner flowers and a package containing perfume; the gift was accompanied by a card that was signed, in respondent's handwriting, "Love, [respondent]." When she was asked, at trial, how respondent's contravention of her direction not to send anything to her on her birthday had made her feel, petitioner answered "I'm scared and—because—yeah, just scared." Petitioner, through her guardian *ad litem*, sought an SPO a few days later. The trial court issued the requested SPO on the basis of the letters and gift that petitioner sent respondent in late 2011 and early 2012.[5]

---

[5] The SPO petition in this case was filed in 2012. Given their remoteness in time, respondent's face-to-face contacts with petitioner in 2007 and 2008 could not serve as the basis for the "repeated and unwanted contact" underpinning the SPO. *See* ORS 30.866(6) ("An action under this section must be commenced within two years of the conduct giving rise to the claim.").

On appeal, respondent argues that the evidence fails to establish the requirements of ORS 30.866 for several reasons. Because it is dispositive, we address only one of his arguments: that the trial court erred in concluding that any unwanted contacts caused petitioner objectively reasonable apprehension for her own personal safety or that of a family member.

We assess the objective reasonableness of a person's apprehension over personal safety by examining the cumulative effect of the relevant unwanted contacts on that person. *Christensen v. Carter/Bosket*, 261 Or App 133, 139-40, 323 P3d 348 (2014). In this case, petitioner does not rely on the contacts between herself and respondent, standing alone, to establish that those contacts caused her to fear for her or her family members' personal safety. That is, petitioner does not contend that the letters and birthday gift from respondent, none of which had any threatening *content*, caused that fear, except to the extent that she was alarmed by receiving a letter and gifts that she had told respondent not to send.

Rather, petitioner's testimony and her arguments to the trial court suggest that her fear was largely based on what her mother had reported about respondent's past, *i.e.*, that he was a "bad person" who previously had been involved with drugs and had acted violently toward petitioner's mother, apparently about a decade earlier. *See Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000) (noting that, in some cases, ostensibly innocuous contacts may take on a more ominous meaning when viewed against the backdrop of the parties' history).

We perceive two difficulties with that argument in the circumstances presented by this case. First, although petitioner testified that she was scared and alarmed, she never tied those fears to any apprehension regarding the "personal safety" of herself or a member of her family. That is, other than stating that she feared that petitioner would "hurt" her if he really were the author of the letters, petitioner never described what it was she feared respondent might do (she did not explain, for example, whether she feared physical or emotional harm). Moreover, no other evidence in the record suggests what type of harm petitioner might have

anticipated. Without such evidence—even assuming that petitioner had an unarticulated apprehension regarding her or her family's safety—the record provides no basis on which a court can assess whether that apprehension was objectively reasonable. Second, the record includes no evidence suggesting that respondent *in fact* had taken any actions that could lead a reasonable person in petitioner's position to fear for her own or her family's personal safety. The record includes no evidence that respondent had acted in any aggressive or intimidating manner toward petitioner or her parents, that he had threatened them, or that he had recently followed petitioner in a way that could reasonably cause her to feel unsafe. Indeed, the record includes no evidence that respondent had come into the physical presence of petitioner or her parents at any time since 2008.[6]

The trial court placed great weight on the fact that respondent was an adult who had ignored the expressed wishes of both the young petitioner and petitioner's parents when he contacted her through "unusual channels." As the trial court found, in sending the letters and gifts to petitioner through third parties, respondent acted irresponsibly and immaturely. Certainly a factfinder could determine that his actions reflect poor judgment. And we agree that the manner in which an adult respondent contacts a child petitioner is an appropriate consideration in assessing the reasonableness of the petitioner's apprehension for her personal safety.

In this case, however, those considerations are not enough to overcome the benign content of respondent's contacts with petitioner and the lack of any other evidence suggesting that respondent wished to harm petitioner or a member of her family. The legislature has not authorized trial

---

[6] Petitioner argues on appeal that she satisfied the "reasonable apprehension regarding * * * personal safety" requirement, ORS 30.866(1)(c), through evidence that petitioner's *mother* experienced such apprehension. That argument conflicts with the position that petitioner took at trial. Then, she argued explicitly that her "reasonable apprehension" was personal to herself, and was based on what she would have felt based on the information that her mother had given her about respondent, regardless of whether that information was accurate. Petitioner did not argue to the trial court that the statutory requirements could be met through evidence that her *mother* reasonably feared petitioner. Accordingly, we do not address that argument further.

courts to issue SPOs for unwanted contact that is unsettling, unusual, or unpleasant. Rather, an SPO can issue only where the evidence establishes that any unwanted contacts have caused the petitioner objectively reasonable apprehension for her or her family's *personal safety.* ORS 30.866(1)(c). That is, the respondent's unwanted contacts must have caused the petitioner objectively reasonable apprehension that the respondent will engage in violence or other conduct that puts the petitioner or her family at risk. *See, e.g., Tesema v. Belete,* 266 Or App 650, 656, 338 P3d 776 (2014) (comparing a case "where [the respondent's] past violence was remote and isolated [in which] we held that the [petitioner's] apprehension was not objectively reasonable" with a different case in which, because "the [respondent's] violence was recent and pervasive, we held that the [petitioner's] apprehension was objectively reasonable"); *Ragsdale,* 265 Or App at 354-55 (affirming SPO where the respondent had been physically aggressive to the petitioner both recently and in the past). *Cf., e.g., Miley v. Miley,* 264 Or App 719, 722-23, 335 P3d 853 (2014) (reversing SPO where there was no history of violence or threats between the respondent and the petitioner); *Braude,* 250 Or App at 130 (reversing SPO where the respondent's unwanted contacts were not "objectively threatening"). No such evidence exists in this case.

Reversed.