Argued and submitted June 10, 2014, reversed February 19, 2015

In the Matter of

Alisha May MILLER,
*Petitioner-Respondent,*

*v.*

Brandon Jack HOEFER,
*Respondent-Appellant.*

Clackamas County Circuit Court
CV13020176; A154043

344 P3d 121

Michael P. De Muniz argued the cause for appellant. With him on the briefs was Ferder Casebeer French & Thompson, LLP.

No appearance for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Respondent appeals a judgment imposing a permanent stalking protective order (SPO) against him under ORS 30.866. Respondent contends, as he did before the trial court, that there was insufficient evidence to support entry of the SPO. We agree and, therefore, reverse.

The trial court ruled:

"[B]y a preponderance of the evidence the bare minimum to sustain the stalking order has been proven. There is contact, repeated and unwanted contact, that * * * is, in part, words, * * * but it is not just a words case.

"I'm finding that there is repeated and unwanted contact that an objectively reasonable person, under the totality of the circumstances would be alarmed by, and that [respondent] knew was unwanted and represents a credible threat * * *."

The court made no additional findings.

We review the facts for any evidence and the legal conclusions based on those facts for legal error. *Travis v. Strubel*, 238 Or App 254, 256, 242 P3d 690 (2010).[1] We presume that, absent express findings, the trial court implicitly found disputed facts consistently with the outcome. *Id.* at 257 (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). With that in mind, we turn to respondent's contacts with petitioner.

Petitioner and respondent dated for several months until petitioner ended the relationship in January 2013. During the latter part of that month, respondent returned a fire pit that belonged to petitioner, placing it in her backyard. Around the same time, respondent set up a fake Facebook profile under the name Shauna Blaze and, posing as Blaze, began a correspondence with petitioner's male friend, Drennan, that lasted for several weeks. On February 2, 2013, respondent returned two other items belonging to petitioner, placing them on her front porch at around 7:30 p.m.

---

[1] "Under ORS 19.415(3)(b), * * * we can choose between reviewing the court's findings *de novo* or applying our usual standard of review." *Travis*, 238 Or App at 256. Neither party requests *de novo* review, and we do not choose to exercise our discretion to review this case *de novo*.

At approximately 1:30 a.m. on the morning of February 3, respondent confronted petitioner at a nightclub. Respondent had learned that petitioner was at the club from Drennan, who had invited "Blaze" to join him and his friends there. After arriving at the club, respondent approached petitioner, called her a "whore" several times and stated, "I'm glad that I found out that you are a whore so I can move on with the rest of my life." Petitioner asked a bartender to get security. A security guard arrived and asked respondent to move away from petitioner. As petitioner was leaving the club, respondent followed behind, "saying things trying to cause a disturbance."

Later that morning, respondent entered petitioner's backyard and took the fire pit that he had previously returned. He also took the other items that he had returned to petitioner's front porch the day before.

Between 3:00 a.m. and 1:00 p.m. that day, respondent sent five e-mails to another friend of petitioner, Dodd, in which respondent asserted, among other things, that petitioner had been lying to and using him, "stepping out" on him, and that she was a "downtown tramp" who did not deserve friends such as Dodd. Respondent also told Dodd that "[t]his is so sad as [petitioner's] two children are so sweet" and that he "hope[d] the best for [petitioner's children] as they are innocent children and great kids at that." In his final e-mail to Dodd that day, sent at 12:15 p.m., respondent stated, "[s]orry for emailing you my drama, was just very hurt not rational thing to do."

That evening, petitioner noticed that the fire pit and other items that respondent had taken from petitioner's home the night before had been returned and were "sitting at the very end of my driveway, basically almost on the edge of the street." The following day, respondent again wrote to Dodd, stating, "it won't be anytime soon for this pain to stop but at least the healing process can start now[,]" and asking Dodd to "give [petitioner's children] a hug for me please (not mentioning my name of course)."

Several days later, on February 7, petitioner filed an SPO petition in which she recounted the above facts and stated that respondent's conduct at the nightclub was

"threatening." Petitioner indicated that the unwanted contact was alarming or coercive, "because of the planning and depths that were taken in order to know what I was doing[,]" and that "the behavior and manner in which [respondent] approached" her and followed her out of the club made her afraid for her personal safety. Petitioner indicated that those contacts did not include any threat that made her afraid that serious personal violence or physical harm would happen to her very soon.

On February 9, respondent sent a final e-mail to Dodd. In that message, respondent stated that he was "torn to reach out [to petitioner] and apologize" and asked Dodd whether he should or not. Respondent stated, "I said a lot in my drunk state and many of the words were just to hurt her back and that helps no one." Respondent told Dodd that he was "hoping you can help give me some closure so I can quit spending time on this."

Around the same time, Drennan's ex-girlfriend, Kauffman, informed petitioner that respondent had e-mailed her several times the morning of February 3—that is, later in the morning of the nightclub confrontation and at the same time that respondent was e-mailing Dodd. In his e-mails to Kauffman, respondent said that he had information that Drennan had cheated on Kauffman. Unaware that respondent and petitioner had dated, Kauffman briefly corresponded with respondent. Respondent asked Kauffmann where petitioner had been on New Year's Eve. After speaking with petitioner, however, Kauffman blocked respondent from contacting her.

Shortly thereafter, respondent e-mailed Kauffman using the alias "Ally Pierce." As Pierce, respondent again accused Drennan of cheating on Kauffman and again attempted to discover petitioner's whereabouts on New Year's Eve. Kauffman became suspicious and asked "Pierce" not to contact her anymore.

At a February 11, 2013, *ex parte* hearing regarding her petition, petitioner informed the court that, after the confrontation at the nightclub, respondent had continued to contact her friends "to find out what I am doing or even like what [I] was doing, * * * that kind of thing." Petitioner also

noted that respondent had been "saying stuff to friends of mine about how my kids are doing." The court entered a temporary SPO against respondent.

At the March 13, 2013, contested hearing regarding entry of a permanent SPO, petitioner recited the facts in her initial petition and added that respondent's correspondence with Kauffman "makes me fearful of why do you care what I was doing." Petitioner also stated that, within the 48 hours preceding the hearing, she had learned of respondent's "previous felony history of violence against other women"—which she said included "felony convictions"—and "spoke to the victim's child of this incident that occurred in '05 and realize[d] the kind of person I was dealing with and my fear of him." Petitioner did not provide additional information regarding respondent's history with other women. Petitioner told the court, "all these things that he did to keep tabs on me in ending our relationship, I have every right to be scared of this person and have every right to be scared of my children's safety in having a stalking order granted." In her closing argument, petitioner contended:

> "[T]he evidence that has been presented just shows the great length to which this person has tried to keep tabs on me, tried to know what I was doing, who I was with. * * *
>
> "* * * * *
>
> "He continued to make * * * the unwanted contact in trying to still talk to people that he knew I was close to, which makes me feel wary of why does he care to have any contact with people that he knows I am close to; that somebody would go to my house and take stuff for what purpose? The evidence is very alarming the lengths that he went to.
>
> "Specifically in some of the stuff that was submitted, the stuff that he referred to my children and missing them, that scares me. * * * Why would you say that to somebody? So all those things make me fearful of this person.
>
> "I don't want any contact with [him], and I'm deathly afraid of what he might do and what he is capable of doing."

With that backdrop, we consider the following relevant legal principles. To establish that an SPO should issue under ORS 30.866, a petitioner has the burden to prove, by a preponderance of the evidence, that each of the requirements

of that statute was met. *Ragsdale v. Fleming*, 265 Or App 342, 348, 336 P3d 534 (2014). In general, a petitioner must establish the following elements:

"First, a respondent's conduct must meet the statutory definition of 'repeated and unwanted contact' with the petitioner or a member of the petitioner's immediate family or household. Second, the petitioner must subjectively—*i.e.*, 'actually'—'be alarmed or coerced by the contacts' and that alarm or coercion must be objectively reasonable. Third, the contacts also must actually cause the petitioner apprehension about personal safety and that apprehension, too, must be objectively reasonable. Finally, the respondent must have acted with the requisite mental state."

*Braude v. Braude*, 250 Or App 122, 128-29, 279 P3d 290 (2012) (citations omitted). When the contact involves speech, it must rise to the level of a threat to be considered a qualifying unwanted contact:

"Under Article I, section 8, of the Oregon Constitution, unwanted contacts that involve speech are subject to a heightened standard of proof. To qualify as a predicate unwanted contact, any contact that involves speech must be a threat—that is, the sort of communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts. The kinds of threatening contacts that may support the issuance of a stalking protective order do not include the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee."

*Jennings v. Gifford*, 211 Or App 192, 196, 154 P3d 163 (2007) (internal quotation marks and citations omitted).

Respondent argues on appeal, as he did before the trial court, that the evidence is insufficient to support the entry of the SPO. Specifically, respondent argues that his comments at the nightclub and in his correspondences with Drennan, Dodd, and Kauffman did not contain any "threat," as that term is used for purposes of ORS 30.866 and Article I, section 8, and that, thus, those comments cannot represent contacts for purposes of an SPO. We agree. Respondent's communications amounted to little more than

"hyperbole, rhetorical excesses, and impotent expressions of anger and frustration." Indeed, petitioner acknowledged as much in her petition, in which she indicated that respondent had not made any threat that made her afraid that serious personal violence or physical harm would happen to her very soon.

As for the other contacts, respondent concedes that following petitioner to the nightclub, confronting her there, stealing her property, and returning that property to petitioner's home all qualify as "contacts" under ORS 30.866.[2] Respondent does not argue that these contacts were other than unwanted. Respondent does contend, however, that petitioner failed to produce sufficient evidence that those contacts caused her objectively reasonable alarm or apprehension regarding her personal safety or the personal safety of her children. Again, we agree.

"We assess the objective reasonableness of a person's apprehension over personal safety by examining the cumulative effect of the relevant unwanted contacts." *Huber v. Landolt*, 267 Or App 753, 759, 341 P3d 175 (2014). Petitioner asserted that respondent's behavior at the nightclub was "threatening" and that "the behavior and manner in which [respondent] approached" her and followed her out of the club made her afraid for her personal safety. Petitioner also referred to respondent's "keep[ing] tabs on me," his "previous felony history of violence against other women," which she said included "felony convictions," and her conversation with "the victim's child of this incident that occurred in '05," which caused her to "realize the kind of person I was dealing with and my fear of him." Petitioner offered no further evidence regarding the nature of respondent's criminal conviction history (for example, any facts regarding respondent's conduct in 2005, the nature of the offense charged, or what sentence respondent received). Citing as well respondent's theft of her property and the comments regarding her children, petitioner stated that, "all those things make me fearful of [respondent]." However, petitioner offered little actual

---

[2] *See* ORS 163.730(3) providing that, as used in ORS 30.866, "contact" includes, "[c]oming into the visual or physical presence of the other person;" "[f]ollowing the other person;" "[c]ommitting a crime against the other person;" and "[d]elivering * * * any object to the home [or] property * * * of the other person."

explanation as to how or why respondent's contacts gave rise to objectively reasonable fear for her or her children's personal safety.

In short, as in *Huber*, "petitioner testified that she was scared and alarmed, [but] she never tied those fears to any apprehension regarding the 'personal safety' of herself or a member of her family." 267 Or App at 759. That is, "petitioner never described what it was she feared respondent might do (she did not explain, for example, whether she feared physical or emotional harm)." *Id*. Without additional evidence to suggest "what type of harm petitioner might have anticipated[,] * * * the record provides no basis on which a court can assess whether that apprehension was objectively reasonable." *Id*. at 759-60. As in *Huber*, no such evidence exists in this case. *See also Miley v. Miley*, 264 Or App 719, 335 P3d 853 (2014) (reversing SPO where the respondent had called the petitioner a "slutty whore," sent anonymous letters to 27 of her friends saying "horrible things" about her, and drove by the street where she lived, because respondent had no history of violence); *Tesema v. Belete*, 266 Or App 650, 656, 338 P3d 776 (2014) (stating that, "where [the respondent's] past violence was remote and isolated, we [have] held that the * * * apprehension was not objectively reasonable" and "where the violence was recent and pervasive, we [have] held that the * * * apprehension was objectively reasonable").

Reversed.