Argued and submitted July 30, affirmed December 5, 2012

Damian AMARILLAS,
*Petitioner-Respondent,*

*v.*

Joshua Bruce WHITE,
*Respondent-Appellant.*

Jackson County Circuit Court
113127Z0; A149377

292 P3d 587

David A. Hill argued the cause and filed the brief for appellant.

No appearance for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Respondent appeals the trial court's entry of a stalking protective order (SPO). The sole issue on appeal is the sufficiency of the evidence supporting that order. Because this is not an "exceptional case" justifying *de novo* review, we review the trial court's factual findings for "any evidence" and its legal conclusions for errors of law. *See Travis v. Strubel,* 238 Or App 254, 256, 242 P3d 690 (2010) (explaining standard of review applicable to SPO appeals); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Applying that standard of review, we conclude that the evidence is sufficient to support the entry of the SPO against respondent. Accordingly, we affirm.

When the sufficiency of the evidence supporting an SPO is challenged, we view the evidence, and all reasonable inferences that may be drawn from it, in the light most favorable to the petitioner. *Delgado v. Souders,* 334 Or 122, 134, 46 P3d 729 (2002). That said, except as noted below, the parties do not present greatly differing versions of the pertinent historical facts, although they disagree vehemently about the significance of several events. Petitioner and respondent worked together for five years at the Drug Enforcement Agency (DEA) and were fairly close friends. At some point, petitioner became engaged to be married and, at a party in December 2010, respondent made offensive comments to petitioner's then-fiancée. Shortly thereafter, petitioner confronted respondent about his comments and told respondent, "[W]e're done. We're not friends anymore, I don't want anything to do with you." That same evening, respondent sent petitioner a string of 19 text messages, starting at 6:14 p.m. and ending at 1:08 a.m. Although petitioner did not save the text messages, he testified that the first message was apologetic, but the next was "more sarcastic" and subsequent messages "would go back and forth in between put downs and threats," including respondent calling petitioner a "douche bag," saying he would "kick [petitioner's] ass" when he next saw him, and saying that petitioner's fiancée should "get a protective order" for

petitioner, because he was "going to need it." Petitioner did not respond to the text messages; instead, he blocked respondent's telephone number.

The next day, both petitioner and respondent went to the office, but they did not say a word to each other. At the SPO hearing, petitioner acknowledged that he had not feared going to work that day, despite knowing that respondent would be there, and despite the fact that—according to petitioner—respondent once had pointed a loaded firearm at him, sometime before their December 2010 confrontation. Petitioner explained that he could choose whether to work with another DEA agent on particular cases, and he had decided no longer to work on cases with respondent.

Within the next week, petitioner learned that respondent had told a supervisor that petitioner had "taken money from a search warrant," was growing medical marijuana for profit, was suicidal, and was "in collections" and "getting property repossessed." During the subsequent investigation, the parties' supervisor decided to keep both men working, even though they worked in the same office space, as their desks were separated by a bank of lockers. Although the men worked in the same office, they did not talk to each other.

On at least two different days in February 2011, respondent repeatedly dry fired his duty weapon when he and petitioner were working at the DEA office. On each of those occasions, respondent dry fired his weapon at least 10 or 15 times over the course of a minute or more. On the first of those occasions, petitioner was alone; on the other, two additional officers witnessed the dry firing. Petitioner did not believe that respondent was dry firing his gun after having cleaned it, as petitioner did not smell any solvent. At the SPO hearing, respondent's counsel asked petitioner on cross-examination whether he had been in fear of respondent harming him with the gun at that point. Petitioner responded, "I was armed at the time, too, sir." Counsel then asked, "My question was, you were not concerned at that point, about him harming you," to which petitioner replied, "I was concerned enough to stand up and walk over to see what he was doing, yes." Petitioner testified

that two other people had complained to a DEA supervisor about the dry-firing incidents.

Respondent acknowledged at the SPO hearing that he had dry fired his gun, but said that he was "just playing with [it]," noting that DEA agents always have firearms at the office. Respondent denied that he had intended to place petitioner in fear when he dry fired his gun. The trial court rejected that aspect of respondent's testimony. Instead, the court explained in its written ruling that it had inferred from the evidence that respondent dry fired his gun with the intent to intimidate petitioner and that petitioner "did experience apprehension as a result of that conduct." The court also found that respondent's conduct constituted contacts that were unwanted by petitioner.

Soon after the dry-firing incidents, respondent stopped working for the DEA for reasons that are not entirely clear from this record.[1] Petitioner eventually was exonerated of the allegations that respondent had made against him. He had no other contact with respondent after February 2011, except for the incident described below.

After leaving the DEA, respondent obtained employment as a detective with the Josephine County Sheriff's ffice. At some point in the past, the Medford Police Department had investigated respondent on other allegations of misconduct unrelated to his dispute with petitioner. Those allegations had resulted in an indictment, but apparently no conviction, although the record does not reveal exactly how the charges were resolved.[2] In June 2011,

[1] Respondent subsequently told an investigating officer that he had been "kicked out of DEA" for blowing the whistle on petitioner, whom he continued to claim had stolen money that had been seized during the execution of a search warrant. Petitioner asserted in a legal memorandum to the trial court that respondent was terminated as a result of the dry-firing incidents. The trial court intimated that respondent may have been removed based on unrelated accusations of professional misconduct.

[2] Respondent apparently believed that petitioner had something to do with those previous allegations, but petitioner denied having had anything to do with them. A Medford police sergeant later told respondent that petitioner had not been involved with that case. The sergeant also acknowledged to respondent that the previous charges against him had "really gone nowhere" and the sergeant said he could understand why respondent was upset by the way the matter had been handled.

and apparently in response to those earlier allegations, the sheriff relieved respondent of certain narcotics-investigation duties (which had given him the opportunity to work significant overtime) and assigned him different responsibilities. Respondent testified at the SPO hearing that the sheriff had told him that he did not want the fact of respondent's previous indictment "to affect their federal cases."

On June 27, 2011, the day after respondent learned of his changed duties, he drove his motorcycle to petitioner's house, stopped near the end of petitioner's driveway, and—seeing petitioner through a window—revved his engine and yelled at petitioner to come outside.[3] Petitioner testified that he believed respondent was armed and threatening him:

> "I can see him yelling and telling me to come out, and at one point, points down like this to his side, and on his right side, I've known the guy for probably about five years, and I have never seen [respondent] not carry his duty gun with him. And at that point it was my belief that he was armed and trying to get me to come out for some type of confrontation. So at that point, my wife called 911. She gets on the phone, and I just stared out the window at him, which is probably a 35, 45-foot driveway, to where he is in the street, still yelling, still motioning for me to come outside. When she gets on the phone with 911, she's standing in view, he starts doing this, and yelling some more, and I don't remember the exact extent of time that he was there, but over five minutes, before he finally drove away."[4]

The trial court found, in keeping with petitioner's testimony, that petitioner was alarmed by what the court characterized as respondent's "provocative behavior."

When petitioner checked his work e-mail the next morning, he discovered the following message from respondent:

---

[3] At the SPO hearing, respondent denied that he had been yelling at petitioner, and said that he had only been motioning to petitioner to come out of his house. The trial court found to the contrary.

[4] By that point, petitioner had married the woman whom respondent had disparaged in December 2010.

"I just wanted to let you know that I am not mad at you in the least! Anyone who doesn't work elder abuse would question the legality of my grandpa adding me to his bank accounts and I don't blame you for reporting it (although AFTER I slapped you upside the head in Portland I'm sorry and said so) Anyway, I heard you guys are afraid of me and that's ridiculous because [you] are a much better shot than me. Anyhow, I really believed you [were] my [friend] and I tried to treat you as such...except you broke the law and committed a felony and that's a problem for me. (Solicitation of 10K is a felony if you look it up) Anyway, there's nothing to worry about since DEA is vouching and covering for you. I'm not trying to trap you or anything and I just wanted you to know today that I forgive you. I hope you and [another person, presumably petitioner's wife] work out, but like [your] dad warned, 'listen to Josh.' You probably won't but you can't say I wasn't [your] friend. Anyway, best wishes and good luck. From a mildly retarded but 'better late than never 'friend.'

"Josh.

"Oh by the way. Thanks for killing my best friend, my grandpa, losing 30K a year in overtime and a million in property! So maybe I'm struggling with forgiveness but I'm trying!!!"

(Uppercase in original.)

At the SPO hearing, petitioner described how he had been affected by those events:

"My fear is, and it's obvious by reading the e-mail, and by several other people he's talked to, that [respondent] thinks that I have turned him in for a past crime that he was investigated for, which I had nothing to do with. And he blames me for losing money, for losing property, for losing his grandfather. And my worry is, this same day that he came over—what triggered that for him to put all the blame on me, and what additional things are going to happen wrong in his life, that he's going to turn around and subsequently blame on me, and come after me or one of my family members for?"

Sergeant Mike Budreau of the Medford Police Department investigated the June 27th incident and, as part of that investigation, interviewed respondent. During

the recorded interview, respondent acknowledged that "they" all were "definitely afraid" of him but characterized those fears as "ridiculous."[5] Respondent said that he had gone by petitioner's house to say that he had forgiven petitioner for what he claimed were petitioner's misconduct and false accusations against him. Respondent denied that he had been armed at the time and explained that he had lifted up his shirt to show that he was unarmed: "[T]hey're all afraid that I want to kill them or something, for getting into this crap, and I didn't want them to—to think that I was carrying a gun."

Respondent told Budreau that the DEA was "covering * * * up" petitioner's misconduct. According to respondent, the DEA had discredited respondent to "get [him] out of their hair, because they know [he knows] the truth." Respondent also said that a Medford police officer who had investigated respondent's allegations against petitioner had lied about what respondent had said. That, too, respondent asserted, was "a coverup" that needed to be looked into by a police officer "who knows how to investigate conspiracies."

Petitioner filed his stalking complaint against respondent on June 29, 2011. A temporary SPO issued and a hearing was set for August 1st. After the hearing, the trial court issued a written ruling that included factual findings that generally reflected petitioner's testimony about his interactions with respondent. On the basis of those findings, the trial court entered the permanent SPO that is the subject of this appeal.

On appeal, respondent assigns error to the trial court's determination that the evidence was sufficient to support the entry of a permanent SPO. He mistakenly asserts that we review the facts *de novo*, citing a case that predates the 2009 change to ORS 19.415(3)(b) that makes *de novo* review discretionary. As noted, we choose not to exercise our discretion to review the facts *de novo* in this case, which is not "extraordinary" for purposes of ORAP

---

[5] During the interview, Sergeant Budreau confirmed that petitioner and his wife were "very scared of" respondent; he also said that petitioner was "quite afraid."

5.40(8)(c). Respondent's arguments on appeal do not all depend on us reviewing the facts *de novo*, however, and we address those in which respondent claims that the trial court erred as a matter of law. We treat his factual arguments as a contention that the trial court's findings are not supported by legally sufficient evidence.

ORS 163.738(2)(a)(B), under which the trial court entered the SPO, provides that a court may enter a

"court's stalking protective order if the court finds by a preponderance of the evidence that:

"(i) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

That statute creates several requirements for entry of an SPO. First, a respondent's conduct must, on at least two occasions, meet the statutory definition of "unwanted contact" with the petitioner or a member of the petitioner's immediate family or household. Second, the petitioner must subjectively—*i.e.*, actually—be alarmed or coerced by the contacts, and that alarm or coercion must be objectively reasonable. Third, the cumulative contacts also must actually cause the petitioner apprehension, and that apprehension, too, must be objectively reasonable. Finally, the respondent must have intentionally, knowingly, or recklessly engaged in the unwanted contact. That is, at a minimum, the respondent must have been aware of a substantial and unjustifiable risk that the contact was unwanted and consciously and unreasonably disregarded that risk. *Delgado*, 334 Or at 133.[6]

---

[6] *Delgado* involved an SPO issued under ORS 30.866, rather than ORS 163.738, as in this case. However, as the court noted in *Delgado*, the requirements for obtaining an SPO are identical under both statutes. 334 Or at 132 n 4.

Article I, section 8, of the Oregon Constitution imposes an additional requirement in stalking cases in which the petitioner "seeks to rely on a contact that involves speech." *Falkenstein v. Falkenstein*, 236 Or App 445, 451, 236 P3d 798 (2010). "To avoid constitutional overbreadth problems, a contact that involves speech can serve as a predicate contact for an SPO only if it is a threat." *Id*. A "threat" is "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). Qualifying threats do not include "'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Id*. (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)).

At the outset, we readily agree with respondent that the series of text messages that he sent in December 2010 and the e-mail that he sent in June 2011 were expressive contacts that do not meet the heightened standard set out in *Rangel*. Specifically, nothing in any of the text messages or in the e-mail gave rise to an objectively reasonable fear of imminent and serious physical harm. Accordingly, although those incidents may serve as context for the other contacts, we do not consider them in their own right. *See Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006) (although speech that is not a threat cannot be a "contact," it can provide context for nonexpressive contacts).

We turn to the remaining contacts, beginning with the February 2011 dry-firing incidents. Respondent argues that those incidents could not constitute "unwanted contacts," as a matter of law, because "they involved the parties at their work place while acting within the scope of their employment as police officers." Respondent invokes ORS 163.755(1)(c), which provides:

"(1) Nothing in ORS 30.866 or 163.730 to 163.750 shall be construed to permit the issuance of a court's stalking

Accordingly, the analysis in that case and others applying ORS 30.866 applies equally here. *Blastic v. Holm*, 248 Or App 414, 422, 273 P3d 304 (2012).

protective order under ORS 30.866 or 163.738 * * * or a civil action under ORS 30.866:

"* * * * *

"(c) By or on behalf of a person not described in paragraph (b) of this subsection [relating to persons in custody] to or against another person who:

"(A) Is a parole and probation officer or an officer, employee or agent of a law enforcement unit, a county juvenile department or the Oregon Youth Authority; and

"(B) Is acting within the scope of the other person's official duties."

Respondent asserts in his appellate brief that the incidents at the DEA office "were not actionable contacts, as they involved both parties while at their work place, when both were acting within the scope of their employment as law enforcement officers." At oral argument, however, respondent acknowledged that, if his intent in dry firing his gun was to intimidate petitioner, under the particular circumstances of this case, the conduct would have fallen outside the scope of his official duties and ORS 163.755(1)(c) would not apply. The trial court expressly found that it *was* respondent's intent to intimidate petitioner, and that is an inference that the court could reasonably draw from the evidence. Given respondent's concession that the "official duties" provision in ORS 163.755(1)(c) would not apply in those circumstances, we conclude that we may consider the dry-firing incidents in determining whether the SPO was properly issued.[7]

With respect to those incidents, respondent challenges the sufficiency of the evidence that the contacts were unwanted or caused petitioner subjective alarm, and he argues that any alarm that petitioner may have experienced was not objectively reasonable. We begin, briefly, with whether the contacts were unwanted. Respondent contends that, even if petitioner's statement, "We're not friends anymore, I don't want anything to do with you," was enough to put him on notice that any further contact was unwanted, petitioner essentially revoked any such notice by going to

---

[7] In light of respondent's concession, we need not address the scope of the "official duties" provision in this case, and we express no opinion on that subject.

work the next day knowing that respondent would be there. At the very least, respondent argues, he was not aware that further contact was unwanted and therefore could not have intentionally, knowingly, or recklessly engaged in unwanted contact.

We disagree. Although petitioner reported to work the next day, he and respondent did not speak to each other for the remainder of respondent's employment with the DEA. A reasonable factfinder could infer from petitioner's refusal to interact with respondent that he did not want any contact beyond the parties being present together in their shared workplace. *Cf. Boyd v. Essin*, 170 Or App 509, 515, 515 n 7, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001) (in context of former wife's SPO petition against former husband, the former husband's assault of the couple's son qualified as an unwanted contact even though it occurred before the couple separated: "Not every contact that occurs before separation is wanted."). It also is reasonable to infer from the fact that respondent also did not speak to petitioner in the months after petitioner ended the friendship that respondent, at the very least, recklessly engaged in the unwanted contact—that is, that he aware that there was a risk that further contact was unwanted and consciously disregarded that risk. *See* ORS 161.085(9) (" 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.").

Respondent next argues that the dry-firing incidents did not cause petitioner subjective alarm. Respondent points out that petitioner continued to go to work after both incidents and never reported any fear or alarm to his supervisor or even complained to respondent about the incidents. He also argues that petitioner did not testify at the hearing that he was alarmed by the incidents.

We agree with respondent that nothing in the record supports the inference that the second of the two dry-firing incidents caused petitioner subjective alarm. There is evidence that two other people in the office complained about the second incident to petitioner's supervisor, but that

does not give rise to a reasonable inference that petitioner himself was alarmed by it. We therefore conclude that the second incident does not constitute a qualifying contact for purposes of issuing an SPO.

We reach a different conclusion with respect to the first dry-firing incident. As respondent points out, when asked whether the incident placed him in fear of respondent harming him with his gun at that point, petitioner initially responded, "I was armed at the time, too, sir." That comment could be understood to suggest, as respondent contends, that petitioner was not alarmed by respondent's conduct. It also could be understood as intimating that petitioner would have been alarmed but for his own ability to protect himself from a threat—in other words, that petitioner believed that respondent may have been threatening him in a manner that would demand an armed response. Whatever meaning that initial testimony carried, however, petitioner then clarified as follows:

"Q:   My question was, you were not concerned at that point, about him harming you, is that [—]

"A:   I was concerned enough to stand up to walk over to see what he was doing, yes."

Petitioner's testimony that he *was* concerned about respondent harming him, in combination with petitioner's initial remark about being armed himself, is sufficient to support the trial court's finding that petitioner was subjectively alarmed by the contact.

As noted, respondent also argues that any alarm petitioner may have experienced was not objectively reasonable. However, respondent does not explain that assertion, and our own review of the record does not persuade us that petitioner's alarm was not objectively reasonable. We reject respondent's argument without further discussion.

The only remaining contact is the June 27, 2011, incident in which respondent stopped his motorcycle in front of petitioner's house and tried to get petitioner to come outside. Respondent argues that the contact did not subjectively alarm petitioner. He also contends that petitioner's belief that respondent was armed and wanted

a physical confrontation is not objectively reasonable under the facts reflected in the record. Respondent asserts that he "simply sat upon his motorcycle on a public street, and did not go on to [petitioner's] property. His hand gestures were not threatening in any manner, and he was not armed." Finally, respondent asserts, without elaboration, that the contact "clearly fail[s] the *Rangel* analysis * * *."

The record before us supports the trial court's finding that the contact at petitioner's home subjectively alarmed him. To be sure, petitioner did not explicitly state that he was alarmed by the contact. However, he testified that he had believed that respondent "was armed and trying to get [him] to come out for some type of confrontation" and that, at that point, his wife called 9-1-1. Furthermore, respondent himself stated in his interview with Detective Budreau that, during the contact, he had lifted his shirt to show that he was not armed because "they're all afraid that I want to kill them or something * * *." The trial court could reasonably infer that petitioner was subjectively alarmed. *See Boyd*, 170 Or App at 518 n 10 (subjective alarm can be inferred in the absence of explicit testimony).

We also reject respondent's argument that petitioner's alarm was not objectively reasonable. Respondent's assertion that he was not armed and that his gestures were not threatening is inconsistent with the trial court's explicit and implicit findings. The court expressly found that respondent's conduct was "provocative" and that it "convincingly and unequivocally expressed to Petitioner Respondent's intention to carry out his threats as well as his ability to do so." In other words, the court found that respondent's gestures were, in fact, threatening—that is, that respondent intended to threaten petitioner and that petitioner perceived the gestures as a threat. Implicit in the court's ruling is a finding that respondent was armed or, at least, intended to be perceived as being armed. Those findings are supported by inferences that reasonably can be drawn from the record, so we are bound by them. Given those findings, we reject respondent's contention that petitioner's alarm was not objectively reasonable.

Finally, respondent asserts that the contact at petitioner's home fails the *Rangel* analysis. Respondent's arguments on that point, however, simply mirror those that he makes in relation to whether the contact meets the requirements of ORS 163.738(2)(a)(B). We already have rejected those arguments, for the reasons set forth above, and they are no more persuasive in the *Rangel* context than they are with respect to the statutory analysis.

To summarize, the first dry-firing incident in February 2011 and the contact at petitioner's home in June 2011 constituted actionable contacts for purposes of ORS 163.738(2)(a)(B). The trial court did not err in issuing the SPO.

Affirmed.