Submitted September 7, reversed December 5, 2012

Vicki Ann NORIEGA,
*Petitioner-Respondent,*

*v.*

Kenneth D. PARSONS,
*Respondent-Appellant.*

Linn County Circuit Court
120246; A150909

296 P3d 522

Jason E. Thompson and Ferder Casebeer French &
Thompson, LLP, filed the brief for appellant.

Vicki Noriega filed the brief *pro se*.

Before Ortega, Presiding Judge, and Sercombe, Judge,
and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Respondent appeals the trial court's entry of a stalking protective order (SPO), challenging the sufficiency of the evidence supporting the order. We do not view this as the sort of "exceptional case" in which *de novo* review would be appropriate. Accordingly, we review the trial court's factual findings for "any evidence" and its legal conclusions for errors of law. *See Travis v. Strubel*, 238 Or App 254, 256, 242 P3d 690 (2010) (explaining standard of review applicable to SPO appeals); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). We agree with respondent that the evidence is not sufficient to support the SPO. We therefore reverse.

When the sufficiency of the evidence supporting an SPO is challenged, we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the petitioner. *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002). Petitioner and respondent were coworkers for a number of years and had become friends. At some point, respondent developed a romantic interest in petitioner, who is married. In early December 2011, respondent sent petitioner flowers at work with a card signed "Santa Claus." At the SPO hearing, petitioner testified that when she discovered that the flowers were from respondent, she took the gift as a "romantic overture" and was "more or less in shock." Petitioner sent respondent a text message saying that she had valued their friendship but that it was "[b]est we keep the friendship in the past" because it was "no longer healthy." Respondent replied with two text messages saying that he was just being honest and telling her his true feelings. Petitioner did not respond to those messages. She then received a text message from respondent's brother asking her to contact him regarding respondent. She did not do so.

Respondent apparently suffered an emotional breakdown and voluntarily admitted himself to the hospital for psychiatric treatment. After he was released from the hospital, respondent sent petitioner a series of text

messages over the course of the next month, beginning with the following on December 16:

> "On the outside chance that you read this, I would like to say thank you. Thank you for what I [k]now had to be done. I appreciate what friendship we had and if it wasn't for you I probably wouldn't be starting school in January. You also helped me to sit back and take a look at myself. Now I know what I need to work on. You made me a better man. Thank you so very much. I do hope that I have the opportunity to be your friend again in the future. May the lord bless you and keep you."

Respondent sent the next message a week later:

> "I am not going to give up on you, I hope you realize that. I know and I understand that you have some hard decisions to make. You should know by now that I support your decisions. I'll will [sic] be around and you still are always will be [sic] in my heart."

Between December 25th and January 1st, respondent sent three text messages, two of which were simply holiday greetings. The other said, "You have a beautiful soul."

On January 5, 2012, respondent sent a text message asking whether or not he was "good enough" for petitioner and asking, "Is it because of my size?" (The trial court described respondent as "a very large man.") Respondent went on to say, "I wish you would talk to me and let me know why you ran away. I guess I don't understand what I did to you to deserve being treated so harsh."

On January 16, respondent sent a message saying, "Still say that you are the cats meow." The next message came three days later, saying, "I hope all is OK with all the flood water," evidently a reference to flooding near the parties' workplace or petitioner's home.

Respondent sent the final text message on January 20:

> "You never will talk you me [sic] will you? I thought you were such a nice person. I guess I need to stop being so nice as well. So I guess I will have to either confront you at work in front of your coworkers or I will come and confront you in front of [your husband]."

Respondent did not contact petitioner again in any way after sending that message.

On January 27, 2012, petitioner filed a petition for an SPO under ORS 30.866. A temporary order issued that day and a hearing was held 19 days later. Petitioner testified at the SPO hearing that she had become increasingly frightened as she received respondent's messages after he was released from the hospital:

> "I definitely knew he had mental weaknesses at that point. I'd known before that with the starting of the flowers and everything. From there on it just—it seemed to get worse and worse and worse. It spiraled out of control and he just didn't know how to stop himself, and I—and I was the recipient of whatever he was going through and I did not feel safe. I felt that I was in danger, and I didn't know what he was going to do or say next. I felt my family was in danger, I felt my coworkers were in danger."

Petitioner testified that she took respondent's last message to be "very threatening" and that, by that time, she was "terrified," in part because respondent knew where she lived. Petitioner reported the messages to the police and to her manager at work.

Petitioner was the only witness at the SPO hearing; respondent did not testify. At the end of the hearing, respondent moved to dismiss the case, challenging the sufficiency of petitioner's evidence. In its ruling, the court found that respondent's text messages illustrated what the court characterized as his "escalation," noting that respondent initially acknowledged and appeared to accept petitioner's wish to end their friendship but ultimately refused to accept that petitioner had "rejected his overtures." The court also found that petitioner "felt physically threatened" when respondent sent her the last text message, on January 20. It found that respondent's use of the word "confront" in that message conveyed aggression: "When he said that he would confront her at work, this was a threat of aggression at work. When he said that he would confront [petitioner's] husband, this was an implied threat of aggression at [petitioner's] home." The court went on to state,

"When viewed in this light, [respondent's] previous texts in which he stated that she must make 'hard decisions,' it is clear that he would not accept the decision which she had already made. In other words, [respondent] was threatening [petitioner] to either accept the relationship on his terms or there would be consequences. Those consequences were spelled out in his text of 20 January—confrontation, aggression, defiance, hostility, or violence at work and at her home."

The court denied respondent's motion to dismiss and entered a permanent SPO. This appeal followed.

In his sole assignment of error, respondent again challenges the sufficiency of the evidence offered in support of the SPO. Specifically, he argues that the record lacks evidence that (1) he was aware that his contacts with petitioner were unwanted; (2) the contacts instilled in petitioner a fear of imminent and serious personal violence; (3) the contacts included unequivocal threats and were objectively likely to be followed by unlawful acts; or (4) petitioner's alarm was objectively reasonable.

Respondent's arguments relate to some of the statutory and constitutional requirements associated with entry of SPOs. Several of those requirements are set forth in ORS 30.866, which provides, in part:

"(1)  A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a)  The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b)  It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)  The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

*See also* ORS 163.730(1) ("'Alarm' means to cause apprehension or fear resulting from the perception of danger."); ORS 163.730(2) ("'Coerce' means to restrain, compel or dominate by force or threat.").

Under that statute, the first requirement for an SPO is that the respondent's conduct meets the definition of "contact"; in addition, the contact must be repeated and unwanted. The remaining statutory requirements have both subjective and objective components. The subjective component requires that the petitioner actually be alarmed or coerced by the contacts and that the contacts actually cause the petitioner reasonable apprehension regarding his or her personal safety. The objective component requires the alarm or coercion and the apprehension regarding the petitioner's personal safety to be objectively reasonable. "[E]ach 'contact,' individually, must give rise to subjective and objectively reasonable alarm or coercion." *Reitz v. Erazo*, 248 Or App 700, 706, 274 P3d 214 (2012).

In addition to the statutory requirements, if a contact involves speech, Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a threat—that is, "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). The threat must be "so unambiguous, unequivocal, and specific to the addressee that it convincingly expresses to the addressee the intention that it will be carried out." *Id.* at 306. "The threat of violence *** must be a genuine threat. That is to say, the danger that the message will be followed by action must be found from the evidence to be objectively probable from the perspective of the factfinder, not only subjectively from the perspective of the addressee." *State v. Moyle*, 299 Or 691, 704, 705 P2d 740 (1985). Proscribable threats do not include "'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Rangel*, 328 Or at 303 (quoting *Moyle*, 299 Or at 705).

The pertinent contacts here consist of the text messages that respondent sent to petitioner. *See* ORS 163.730(3)(d) ("contact" includes "[s]ending or making written or electronic communications in any form to the other person"). All of those messages involved speech. Therefore, to support issuance of the SPO, at least two of the messages must have constituted threats that are proscribable under the test set forth in *Rangel*.

Because it is dispositive, we address only respondent's contention that petitioner adduced insufficient evidence that any of the contacts were objectively likely to be followed by unlawful acts. We acknowledge the trial court's determination that petitioner was credible and that she genuinely experienced fear and felt threatened by respondent's communications. But petitioner's subjective concern is not sufficient to support entry of the SPO. Under *Rangel*, respondent's communications with petitioner could qualify as unwanted contacts supporting an SPO only if they also included unequivocal threats of violence that were "objectively likely to be acted upon." *Brown v. Roach*, 249 Or App 579, 585, 277 P3d 628 (2012). The text messages in this case do not meet that standard; nothing in the record supports an *objective* determination that respondent intended to carry out any threat that was implicit in his messages to petitioner and probably was going to do so. Indeed, even if the escalating text messages would make it objectively reasonable to believe that respondent likely would follow through on his threat to "confront" petitioner, no evidence suggests that such a confrontation probably would involve violence or other unlawful acts. That is, no evidence supports a reasonable inference that respondent's implicit threats of aggression were anything more than "impotent expressions of anger or frustration." *See Rangel*, 328 Or at 303; *see also Brown*, 249 Or App at 585 ("offensive, hostile, and aggressive statements are not enough" to satisfy the *Rangel* standard). It follows that none of respondent's messages to petitioner qualified as contacts for purposes of ORS 30.866. In short, the record does not include evidence sufficient to support entry of the SPO.

Reversed.