Argued and submitted March 14, affirmed October 29, 2014

Efrem TESEMA,
*Petitioner-Respondent,*

*v.*

Tsige Denkew BELETE,
*Respondent-Appellant.*

Multnomah County Circuit Court
120506470; A152264

338 P3d 776

Paul G. Dodds argued the cause for appellant. With him on the briefs were Cary R. Cadonau and Brownstein Rask.

Ken A. Kissir argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Respondent appeals the trial court's entry of a stalking protective order (SPO) pursuant to ORS 30.866. Assigning error to the court's entry of the SPO, respondent argues that the evidence was legally insufficient. We disagree with respondent and, accordingly, affirm.

Respondent requests that we review the facts *de novo*. *See* ORS 19.415(3) (stating the Court of Appeals has discretion to review *de novo* in equitable actions). We exercise that *de novo* review sparingly and only in exceptional cases. ORAP 5.40(8)(c). This is not an exceptional case. Thus, we review the trial court's factual findings for any evidence and the legal conclusions based on those findings for errors of law. *Brown v. Roach*, 249 Or App 579, 580, 277 P3d 628 (2012). In light of that standard, the facts are as follows.

A schism developed within a small church, splitting the membership into two factions, one aligned with the priest and the other aligned in opposition. When the schism first became violent, petitioner had been the head priest for over 11 years and respondent had been a member of the church for over 20 years.

As head priest, petitioner lived in a residence located within the church building. The fact that petitioner resided in the church was a source of contention, and respondent, a member of the faction that opposed petitioner, told petitioner that he would have to leave his residence. Petitioner's residence is attached by a doorway to a kitchen. That kitchen, in turn, opens into a rectangular meeting hall where church members gather after services. The meeting hall, which is furnished with long tables and folding chairs, was the scene of a melee following services one afternoon when between 20 and 30 members of the church had gathered there, filling the meeting hall to near capacity.

Portions of the melee were captured on two separate video recordings taken from different sides of the meeting hall. Particular individuals engage in physical confrontations, while others stand against the walls avoiding confrontations, and still others attempt to intervene. The more

overtly physical confrontations come in waves, occurring among a group near the exit to the parking lot, and then occurring in the back corner of the meeting hall near the kitchen where petitioner stood protected by three to four church members. Petitioner did not engage in any physical confrontations.

Respondent was among a small group of people tussling with the church members protecting petitioner. Respondent and others among her group attempted to make physical contact with petitioner. During one attempt, respondent hit a member protecting petitioner with an object. Next, she picked up a small container of powdered creamer from a table and threw the container at petitioner's head, though the container did not hit petitioner or anyone else. The record does not disclose what material the creamer container was made of nor its exact size, but the video shows it was small enough to be palmed in respondent's hand.

Following the throw, one of the members protecting petitioner removed respondent to the parking lot, and another removed a man identified as respondent's husband, who had been engaged in physical confrontations elsewhere in the meeting hall. Moments later, respondent re-entered the hall followed by her husband, who proceeded to pick up a folding chair that he attempted to swing overhead onto the head of the man who had been defending petitioner, but he was stopped by a third man. Soon, police arrived and the melee ended.

At the SPO hearing, petitioner testified that he was "scared" and "shaky" following the melee, but that he allowed respondent to return to services and later attempted formal conciliation. Despite his fear of respondent during the melee, petitioner testified that he did not, at that point, attempt to exclude her from the church because his responsibility as priest was to resolve conflict with forgiveness. Respondent continued to participate in the church, though she usually arrived after services had ended.

A second physical confrontation took place seven months later when respondent was in the church kitchen, which opens into the meeting hall where other church members were gathered. Another church member advised

petitioner to lock the door to his residence that connects to the kitchen. Instead, petitioner opened the door, and respondent began to yell at him. She picked up a 40-gallon plastic garbage can and threw it at petitioner who, standing in the doorway to his residence, was about three feet away. The garbage can did not hit petitioner, but coffee cans and other garbage that fell from the garbage can did. During this encounter, respondent yelled at petitioner, saying either that the "devil is on you" or calling him "Satan." She also told petitioner, "You will depart this church either dead or alive." Petitioner was not hurt by the throw, but he was frightened.

Petitioner, speaking through an interpreter at the SPO hearing, described how respondent had changed over the course of their acquaintance, saying:

"And she's completely change[d] from the way I used to know her. She—every time she see me her face, facial expression, is changed and everything is changed."

Petitioner also explained that touching a priest carries special significance for members of the group's faith, and he reported the effect that those confrontations and the repeated violation of that norm had on him:

"And in also our culture and our political terminology or saying, after the priest teach and get out you cannot even touch priest clothes, but all you can do is to—is to—blessed by the cross.

"That was embarrassing. That and the other way, the children were there and that is setting some kind of role model for children not to respect the priest or the church and that's embarrassing.

"In my life, she say she will do something more tomorrow. I was scared for my life and I really don't want to come here, but I scared for my life and I didn't want to waste my time here. I was scared for my life—I have children. I have a family and I scared for my life."

On appeal, respondent contends that the trial court erred in entering an SPO, arguing that the evidence is legally insufficient. In particular, respondent contends that the evidence does not show that her contacts with petitioner were objectively alarming. Petitioner argues that his alarm was objectively reasonable. We agree with petitioner.

ORS 30.866, the statute governing SPOs, provides, in part:

"(1) A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

*See also* ORS 163.730(1) ("'Alarm' means to cause apprehension or fear resulting from the perception of danger.").

Thus, for an SPO to issue under ORS 30.866, a respondent must make repeated—that is, two or more— unwanted contacts with a petitioner. *Brown*, 249 Or App at 583. Moreover, "each 'contact,' individually, must give rise to subjective and objectively reasonable alarm or coercion." *Reitz v. Erazo*, 248 Or App 700, 706, 274 P3d 214 (2012). Subjective alarm "requires that the petitioner actually be alarmed or coerced by the contacts and that the contacts actually cause the petitioner reasonable apprehension regarding his or her personal safety."[1] *Noriega v. Parsons*, 253 Or App 768, 774, 296 P3d 522 (2012). Objectively reasonable alarm requires that the apprehension regarding the petitioner's personal safety be objectively reasonable. *Id*. To determine whether a petitioner's apprehension is objectively reasonable, we consider "all of the circumstances of the parties' relationship." *Brown*, 249 Or App at 587. Moreover, "[w]e recognize that conduct that might appear benign when viewed in isolation can take on a different character when

---

[1] Petitioner—whom the trial court found credible—testified that both contacts with respondent caused him to fear for his life. Thus, petitioner was subjectively alarmed at each contact. Because petitioner was subjectively alarmed at each contact, we only analyze the objective prong.

viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other." *Braude v. Braude*, 250 Or App 122, 130, 279 P3d 290 (2012).

Last, if speech alone is the basis for a contact, Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a threat—that is, "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999).

Respondent has twice had contact with petitioner for the purpose of ORS 30.866: The first contact occurred during the melee, and the second contact occurred in the doorway to petitioner's residence. Only the second contact involved speech because during that encounter respondent said to petitioner, among other things, "You will depart this church dead or alive." Although respondent's statements do not meet the *Rangel* standard, speech communications that fall short of that standard, "nevertheless, are relevant context for respondent's nonexpressive contacts." *Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006); *see also Christensen v. Carter/Bosket*, 261 Or App 133, 140-41, 323 P3d 348 (2014). Here, we consider respondent's statements only as context for her nonexpressive contacts. Consequently, the only question on appeal is whether petitioner's apprehension was objectively reasonable at each contact.

Respondent argues that neither contact created an objectively reasonable apprehension for petitioner's personal safety because, neither contact, taken in context, was disquieting enough to justify a reasonable person's apprehension. Instead, she argues that the contacts were merely harassing or annoying. Respondent contends four elements of context support her argument: First, the parties knew each other for a number of years preceding these events during which there was no history of violence; second, the parties' relationship continued through the church after the first contact; third, the contacts were related to church politics; and fourth, respondent and petitioner were not alone during the contacts.

We begin by addressing respondent's first contention—that the parties' history belies petitioner's reasonable apprehension. Respondent compares this case to two cases that each involved SPO's entered against former husbands who began to drive by the homes of their ex-wives. In *Braude*, the respondent had engaged in two isolated acts of physical aggression directed at the petitioner nearly five years prior to his more recent nonviolent behavior. 250 Or App at 127. Whereas, in *Boyd*, the respondent had consistently physically abused petitioner throughout their marriage and persisted in disquieting, though not physical, behaviors after the marriage ended. *Boyd v. Essin*, 170 Or App 509, 511-13, 12 P3d 1003 (2000). In *Braude*, where past violence was remote and isolated, we held that the respondent's apprehension was not objectively reasonable, 250 Or App at 130; in *Boyd*, where the violence was recent and pervasive, we held that the respondent's apprehension was objectively reasonable. 170 Or App at 519.

Here, respondent wants to place this case on a continuum with *Braude* and *Boyd*. Respondent's continuum would begin with this case, with no history of violence, progress to *Braude*, with its remote history, then move to *Boyd*, with its recent history. But, such a construction misunderstands *Braude* and *Boyd*. In those cases, this court considered how past violence gave context to present nonviolent behavior. Respondent wants *Braude* and *Boyd* to stand for the inverse—she wants past peace to give context to present violence. But respondent's past peaceful behavior is not relevant on appeal because petitioner testified that respondent "completely change[d] from the way I used to know her." The trial court accepted petitioner's testimony that respondent had changed and that testimony is supported by evidence in the record. Thus, we are bound by it. *See Amarillas v. White*, 253 Or App 754, 766, 292 P3d 587 (2012). Moreover, respondent's continuum is flawed because it runs counter to SPO case law, which is replete with scenarios where warm relationships turn hostile. *See, e.g., Ragsdale v. Fleming*, 265 Or App 342, 336 P3d 534 (2014) (upholding an SPO where a romantic partner became hostile); *Amarillas*, 253 Or App 754 (upholding an SPO where a friendly coworker turned hostile); *State v. Shields*, 184 Or App 505, 56 P3d 937 (2002)

(upholding a conviction for stalking where a friend turned hostile).

Thus, we reject respondent's first contention and turn to respondent's second contention—that the parties' continued relationship after the melee proves that petitioner was not reasonably apprehensive for his personal safety following that contact. Just as parties to an SPO are often acquainted when the relationship becomes alarming to a petitioner, occasionally, the party's relationship continues even after a petitioner becomes alarmed. In *Amarillas*, the respondent and the petitioner were friends who both worked as DEA agents in the same office space, though their desks were separated by a bank of lockers. 253 Or App at 755-56. The respondent made offensive comments to the petitioner's fiancé, sent the petitioner a string of text messages stating or implying that he might harm the petitioner and his fiancé, and made accusations to a supervisor—which were later found to be unsubstantiated—that the petitioner was involved in illegal activities. *Id*. Then, in the office, the respondent "dry fired" his duty weapon 10 to 15 times in the petitioner's presence. *Id*. The parties continued to work in the same space, and the respondent again "dry fired" his duty weapon in the office in the petitioner's presence. *Id*. at 756-57. The respondent argues that *Amarillas* stands for the proposition that, by returning to their mutual work space, the petitioner demonstrated that he was not alarmed by his coworker's actions. In fact, *Amarillas* stands for the opposite proposition. In *Amarillas*, we agreed with the trial court that the first "dry fire" incident was both subjectively and objectively alarming for purpose of ORS 30.866, and, even though the parties continued to work in the same office space, that incident was a qualifying contact for purpose of an SPO. *Id*. at 765-66.

Consistently with that understanding of *Amarillas*, we reject respondent's contention that petitioner's apprehension following the first contact was not objectively reasonable because respondent and petitioner continued to see each other at the church. Here, petitioner, who was head priest, did not attempt to bar respondent from the congregation following the melee during which respondent repeatedly attempted to breach a scrum defending petitioner,

struck one of the defenders with an unidentified object, and then threw a creamer container at petitioner's head. After that encounter, petitioner attempted formal conciliation. As with *Amarillas,* the parties here are members of a shared and mutually important institution. Given the importance of membership to the parties and their respective roles within that institution, petitioner's continued dealings with respondent through the church do not demonstrate a lack of objectively reasonable apprehension. This is especially true in light of petitioner's testimony that it is his role as head priest to resolve conflict with forgiveness.

We analyze respondent's final contentions together—namely, that because the contacts were related to church politics and occurred when others were present, the contacts were only annoying or harassing, and not objectively alarming. Taken in isolation, respondent's physical acts amount only to two missed throws. But we do not view the contacts for purpose of an SPO in isolation; rather, we view the contacts in context. *Brown,* 249 Or App at 587. The most general context of these contacts was a schism within a small church that stirred passions sufficient to precipitate a melee. A church, like other contexts in which we have upheld qualifying contact for SPO's—such as a workplace, *Amarillas,* 253 Or App 754, or a romantic relationship, *Boyd,* 170 Or App 50—is an intimate setting requiring close encounters, where passions are aroused and may go unresolved. Because a church schism shares those characteristics with contexts that also support objective alarm, we reject respondent's contention otherwise. Moreover, the public nature of the acts takes on meaning within the context of the church schism. The first contact occurred during a melee in the meeting hall in which respondent was the boldest member of a group attempting to make physical contact with petitioner. The second contact occurred in the church kitchen, which is connected by a door to petitioner's residence and which opens into the meeting hall where other church members were gathered. Public violence is objectively alarming in this context because individual violence tends to encourage group violence. In fact, after respondent threw the creamer container at petitioner's head, her husband attempted to hit a man who had been defending petitioner over the head

with a chair. Fear of future harm is precisely what our case law encapsulates in the phrase "apprehension regarding the petitioner's personal safety." Therefore, the fact that respondent's supporters were present during the contacts does not make her actions less objectively alarming, but rather more so.

Thus, we reject respondent's argument that petitioner was not objectively alarmed at either contact and conclude that he was objectively alarmed at each. An objective person would be apprehensive for his personal safety when confronted with respondent's physical acts within the context of a conflict within a shared mutually important institution—an institution that is the sort that elicits passionate responses. During both contacts, respondent acted in public in front of partisans to the conflict, and her individual act of public violence tended to provoke, and may have in fact provoked, acts of increasing group violence. Moreover, she had known petitioner for years but had completely changed. He was the priest of her church, but respondent called him "Satan" or else said that "the devil is on [him]," and, during the second contact she said, "You will leave this church dead or alive." While neither of respondent's assaultive acts caused petitioner physical injury, the objective component of ORS 30.866 does not require physical injury for the entry of an SPO, but rather objectively reasonable apprehension regarding the petitioner's personal safety. *Noriega*, 253 Or App at 774. On these facts, we conclude that petitioner had objectively reasonable apprehension regarding his personal safety at both contacts and, therefore, was objectively alarmed by respondent's physical acts in each instance.

In sum, respondent had two unwanted contacts with petitioner during which petitioner was subjectively alarmed and during which petitioner's alarm was objectively reasonable. Though one contact involved speech, that speech is not the basis for the contact for purposes of ORS 30.866. Therefore, the court did not err in issuing the SPO.

Affirmed.