Argued and submitted May 28, 2015, reversed April 20, 2016

Nichole Marie GRAY,
*Petitioner-Respondent,*

*v.*

Jeffrey Scott McGINNIS,
*Respondent-Appellant*

Washington County Circuit Court
C137906CV; A156079

374 P3d 941

Jesse Merrithew argued the cause for appellant. With him on the brief was Levi Merrithew Horst LLP.

No appearance for respondent Nichole Marie Gray.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

FLYNN, J.

**FLYNN, J.**

Respondent appeals from the trial court's entry of a stalking protective order (SPO), issued pursuant to ORS 163.738. He contends that the trial court erroneously based the SPO on text and voice messages that express constitutionally protected speech. *See State v. Rangel*, 328 Or 294, 306, 977 P2d 379 (1999). We agree with respondent that the text and voice messages do not satisfy the *Rangel* standard for contacts involving speech and that the record contains no evidence of other contacts sufficient to permit the SPO.

Neither party has requested that we review this matter *de novo,* and we decline to do so. *See* ORAP 5.40(8) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Therefore, given the trial court's conclusion that the SPO should issue, "we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the petitioner." *Noriega v. Parsons*, 253 Or App 768, 770, 296 P3d 522 (2012). We review as "a question of law whether the evidence presented was sufficient to support the elements required to obtain an SPO." *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002).

## I. BACKGROUND

Petitioner and respondent met through petitioner's work for an establishment called the Sinful Fashion Boutique. Petitioner described her work at the boutique as modeling lingerie for individual customers, and respondent was one of her customers. After their first meeting, in September 2013, respondent scheduled an appointment to meet petitioner every day for approximately two weeks. He then stopped calling or coming to the boutique for several weeks, but resumed appointments with petitioner around October 20, 2013.

Petitioner testified that she "didn't feel comfortable" with respondent from the beginning. She also testified that, during the time that respondent was a customer, he occasionally made comments that were "kind of like a red flag"

for petitioner, including that he wanted to be her boyfriend.[1] She did not respond to the comments.

Petitioner went out of town and returned on November 8, 2013. On that day, as petitioner approached her workplace, she saw respondent looking into the building through a window. That conduct "creeped [her] out," and she decided not to return to work at the boutique. When she explained her concern to her employer, he allowed her to borrow her work cell phone while she looked for other work. That cell phone used the phone number through which respondent had made his appointments with petitioner at the boutique, and the phone displayed his name when he called.

Petitioner did not see respondent after November 8. But a few days later, respondent sent a series of text and voicemail messages "that were really weird" to the work cell phone that petitioner was continuing to use. Petitioner did not respond to any of the messages. Petitioner also learned that respondent had posted a note on the door of her former workplace, which listed petitioner's name and work cell phone number as well as a "new address" and the message "come join me at new place." The "new address" was not petitioner's address, but it belonged to a woman with a similar name. Petitioner implied that the note was disturbing because she did not know how respondent had been able to learn her full name, although her full name was posted in an online listing for the Sinful Fashion Boutique.

On November 24, respondent left threatening voicemail and text messages on the cell phone, suggesting that he had found petitioner's house and that he was waiting for her outside. He gave a house address and wrote, "Nice grey house silver car and such hate to spill the beans but I found your house" and "Stressed." In a voicemail message, respondent told petitioner that if she did not talk to him in 15 minutes it would not be "pretty":

---

[1] Petitioner was also uncomfortable with comments that respondent made, while her customer, about having seen petitioner around town—at a gas station and eating at a Burgerville restaurant—and about seeing petitioner's sister in Hillsboro. Petitioner found the comment about her sister "bizarre" because her sister "lives nowhere near here."

"Have it your way. You know, it's not going to be pretty I don't think. I'm giving you one last chance, like 15 minutes or (laughs) well, you ought to be stressing hard now. I would be."

Petitioner testified that the address respondent gave for the house was not hers, it was the address posted on the "new address" note. Petitioner was out of town when she received the message, but she called the police because she was worried about the safety of any people inside the house. Petitioner also feared for her own personal safety because respondent was apparently watching a home that he believed to be hers. The police suggested that petitioner seek the SPO.

In the stalking complaint, which the Beaverton Police Department helped petitioner create, the unwanted contacts are described as follows:

"Respondent leaves unwanted and concerning voicemails and text messages for petitioner that cause her fear. Respondent found woman with same name and went to her residence believing it was petitioner's."

At the hearing, respondent argued that the messages left on petitioner's phone could not be used to support the SPO because they do not meet the standard of "direct and unequivocal threats to her physical safety," which *Rangel* requires before speech-based contacts can support an SPO. Respondent also argued that the messages should be understood, in the context of petitioner's line of work,[2] as simply "a threat to expose her for what she was doing because [respondent] was under the mistaken impression that she had some nice suburban life" and wanted "to expose how she made her living to her family."

## II. ANALYSIS

Under ORS 163.738(2)(a)(B), a court may enter a stalking order if the court finds by a preponderance of the evidence that

"(i) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other

---

[2] Petitioner advertised her services on websites for "escorts."

person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

Thus, as the Supreme Court has emphasized, to obtain an SPO, a petitioner must establish that—on at least two occasions—the respondent contacted the petitioner while "subjectively * * * aware of a substantial and unjustifiable risk" that the contact was "unwanted by the recipient, and then consciously and unreasonably disregard[ed] that risk." *Delgado*, 334 Or at 133. Moreover, to establish the requisite mental state, the petitioner must present some evidence that, at the time the contacts were made, the respondent "knew or should have known" that they were unwanted. *Travis v. Strubel*, 238 Or App 254, 257, 242 P3d 690 (2010).

When a party seeking a protective order relies on contacts that are speech based, Article I, section 8, of the Oregon Constitution imposes an additional requirement. In *Rangel*, the Supreme Court resolved a constitutional challenge to ORS 163.732 by requiring that an SPO may be based on speech-based contacts only if the contacts express a threat that "instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." 328 Or at 303. Those characteristics "exclud[e] the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." *Id.* (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985) (brackets in *Rangel*)). The speech-based threat must be "so unambiguous, unequivocal, and specific to the addressee that it convincingly expresses *to the addressee* the intention that it will be carried out[,]" and that the actor has the ability to do so. *Id.* at 306 (emphasis in original).

In considering petitioner's request for an SPO, the trial court rejected respondent's contention that the contacts should be analyzed under the standard set forth in *Rangel*. Citing respondent's comments to petitioner about having seen her at businesses around town and his act of going to a house in which he believed petitioner lived, the court reasoned that "this is not just speech based contact." The trial court also found that "[t]here was no specific saying, 'Don't contact me,' or anything of that nature. But given that for a very long period of time, or at least a significant period of time, there was no response," respondent knew or should have known that his repeated contacts with petitioner were unwanted. Finally, the court found that the contacts caused petitioner alarm and apprehension regarding her personal safety and concluded that her alarm was objectively reasonable. The court, therefore, issued the SPO.

On appeal, respondent divides the contacts into two groups: contacts up to and including November 8, 2013, and contacts after November 8, 2013. With respect to the earlier group, respondent argues that there is no evidence to permit a finding that respondent "knew or should have known" that any of the contacts were unwanted or that any of the contacts alarmed petitioner. With respect to the later group, respondent argues that the contacts involved speech and do not satisfy the *Rangel* standard for a qualifying speech-based contact. We conclude that the record lacks evidence of the qualifying contacts necessary to support the issuance of the SPO, because respondent's "unwanted" speech-based contacts (the voicemail and text messages) do not satisfy the *Rangel* standard and because the evidence of nonexpressive conduct describes, at most, one qualifying contact.

## A. *Contacts Up To and Including November 8, 2013*

Given the trial court's findings regarding when respondent "should have known" that his contacts were unwanted, contacts through November 8, 2013, cannot be considered qualifying contacts for purposes of the SPO. As the trial court found, petitioner never told respondent to stop contacting her. Nevertheless, the trial court concluded that respondent should have known that his contacts were unwanted, based on petitioner's failure to respond to

respondent's text and voicemail messages after November 8. Assuming that petitioner's failure to respond to text and voice messages could be a basis for concluding that respondent should have known that his continuing contact was unwanted, there is no evidence that petitioner ignored respondent's messages, or otherwise conveyed a lack of interest in respondent's contacts, until after November 8, 2013—the day petitioner saw respondent looking through the windows of her workplace and decided to quit working.

Although the court indicated that it was not relying on contacts that had occurred while petitioner and respondent "were engaged in their business behavior,"[3] the court nonetheless referred to some of those earlier contacts in support of its finding that not all of respondent's contacts were speech based. The court cited, in particular, respondent's comments about having seen petitioner at businesses around town, although respondent made those comments during the time that he and petitioner were "engaged in their business behavior." Earlier contacts can provide context for later contacts. *See Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006) (expressive contacts that do not otherwise qualify for the purposes of an SPO nevertheless provide relevant context for nonexpressive contacts). However, to the extent the court counted the contact on November 8, 2013, or earlier contacts as predicate contacts for the issuance of an SPO, it did so in error.

B. *Phone Contacts After November 8, 2013*

Most of the contacts described by petitioner after November 8, 2013, were the numerous text and voicemail messages that respondent left for petitioner on her work cell phone after she left work.[4] Although some of the messages

_____

[3] The court stated:

"The fact that she perhaps had contact with him during her business, whatever business it is, is before things escalated, before things get to the point where we are concerned or she is concerned and the Court is concerned about the stalking behavior. I'm not looking at any of the contacts while they were engaged in their business behavior. I am looking at the contacts after, when clearly she by her own behavior has decided she no longer wants to have contact with him."

[4] Petitioner testified that the messages began "a few days" after November 8. The first text message in the record is dated November 18.

are innocuous and even seemingly friendly, the worst of the messages are offensive and disturbing:

On November 18, 2013:

"Better keep running away for this stress has only begun. You should not have done me this way. Portland/Vancouver is a very small place, you won't be missed. Even crying won't help u now :)

"Sucks to be u :)"

On November 19, 2013:

"Nasty [petitioner's name] you are no fun could at least say fuck you to me

"Where you running from your hex will greet you where you hide that's a fact

"Crying yet [petitioner's name]."

On November 20, 2013:

"Your cold aren't you the hex should be catching you by surprise by now, how does it feel to run only to be met with voodoo?"

Those messages may have caused petitioner "reasonable apprehension regarding [her] own personal safety," as the trial court found, but that is not enough when contacts are speech based.

We agree with respondent that the messages were speech-based contacts and do not meet the heightened standard set out in *Rangel* for speech-based contacts. *See Amarillas v. White*, 253 Or App 754, 755, 762, 292 P3d 587 (2012) (text messages and email conveying threats to "kick [petitioner's] ass" when respondent next saw him and that petitioner was "going to need" a protective order were expressive contacts that do not meet the heightened standard set out in *Rangel*). We also agree with respondent that none of the messages described above rises to the level of a threat "that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts," as required by *Rangel*, 328 Or at 303 (citing *Moyle,* 299 Or at 703-05); *see Goodness v. Beckham*, 224 Or App 565, 578, 198

P3d 980 (2008) ("In light of the parties' abusive past, it was objectively reasonable for petitioner to be alarmed by respondent's threats that 'I'm going to get you back' and 'you['re] going to pay.' However, those statements do not unequivocally threaten *violence*[,]" so could not be a basis for a SPO. (Emphasis and brackets in original.)). We therefore conclude that those messages cannot be considered predicate contacts for purposes of the SPO.

The most troubling messages were sent on November 24, when respondent believed he was outside of petitioner's house. The record contains a transcript of one of the voicemail messages that respondent left for petitioner:

"Have it your way. You know, it's not going to be pretty I don't think. I'm giving you one last chance, like 15 minutes or (laughs) well, you ought to be stressing hard now. I would be."

Text messages that petitioner sent the same day advise, "Nice grey house silver car and such hate to spill the beans but I found your house"; "Stressed."

Like the earlier messages, the messages on November 24 were speech based and, therefore, must meet the heightened *Rangel* standard to qualify as a predicate contact for the SPO. Moreover, although respondent delivered the messages in combination with his nonexpressive act of visiting the house that he believed belonged to petitioner, *Rangel* requires us to consider whether "the communicative act itself is unprotected because, for example, it is a prelude to imminent and serious proscribable harm." 328 Or at 301.

We conclude that, like the earlier messages, the messages delivered on November 24 do not communicate the kind of threats that would instill in petitioner "a fear of imminent and serious personal violence" that is "unequivocal" and "objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303. The messages do not express an unambiguous threat of imminent and serious personal violence to petitioner. Moreover, the messages would not instill an objectively reasonable fear that respondent had the ability to carry out any threatened harm. Petitioner had no connection to the home that respondent was urging her to

come out of. Indeed, petitioner was not even in town when respondent left the messages.[5] Under the circumstances, we conclude that the messages do not satisfy the heightened *Rangel* standard that is necessary in order to rely upon them as qualifying predicate contacts for the SPO. Thus, the record contains no evidence of expressive contacts that qualify as predicate contacts for issuance of the SPO.

## C. *Other Contacts After November 8, 2013*

We also agree with respondent that there is no evidence he engaged in nonexpressive conduct that would constitute repeated unwanted "contacts" of the kind necessary for an SPO. Although the record contains evidence of two nonexpressive contacts between petitioner and respondent after November 8, 2013—*i.e.*, after respondent could have known his contact was "unwanted"—we conclude that there was at most one qualifying contact.

First, we examine the potential "contact" that occurred when respondent visited petitioner's former employer to leave a note.[6] Petitioner's testimony permits an inference that, at some point after November 8, respondent posted a note on the door of her previous place of employment, which petitioner learned of through a former coworker. Although the note itself involved speech that does not meet the *Rangel* standard,[7] the note "can provide 'relevant context for' [the] nonexpressive" conduct of posting it at petitioner's former place of work. *Blastic v. Holm*, 248 Or App 414, 419, 273 P3d 304 (2012) (quoting *Habrat*, 208 Or App at 237)). However, when we analyze a contact that includes both expressive and nonexpressive conduct, we apply the *Rangel* standard unless "the act that causes alarm or coercion

---

[5] As noted, in response to the court's inquiry, petitioner told the court that she was afraid of what might happen if respondent found her. But she also testified that, although she felt that the messages were threatening, she was not scared that petitioner would find her, "because there's really no way for him to find me[.]"

[6] The trial court did not identify this incident as a qualifying contact for issuing the SPO, but we, nevertheless, examine whether it would provide an alternative basis to affirm.

[7] Even if respondent's purpose in creating the note was to warn petitioner that he (believed) he knew her address and full name, that is not a threat that meets the *Rangel* standard.

is based on the nonexpressive conduct[.]" *Christensen v. Carter/Bosket*, 261 Or App 133, 140, 323 P3d 348 (2014). Here, although petitioner described concern about the contents of the note, nothing in the record permits us to determine that respondent's nonexpressive conduct in leaving the note at petitioner's former workplace caused petitioner "reasonable apprehension regarding [her] personal safety."

Finally, we consider petitioner's act of waiting outside of a home that he believed belonged to petitioner when, in reality, the home belonged to someone petitioner did not even know. We need not decide whether this act could conceivably be construed as a "contact" for purposes of issuing an SPO,[8] because it is a single incident and cannot satisfy the requirement of "repeated" qualifying contacts.

Reversed.

---

[8] ORS 163.730(3) contains a nonexclusive list of "contacts" that support an SPO, none of which extend to respondent's act of waiting outside a home to which neither petitioner nor anyone she knows has a connection.